UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TIMOTHY ROBERT CARRILLO, | ) | Case No.: 1:12-cv-01203-JLT |
| Petitioner, | ) ) | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (Doc. 2) |
| v. | ) ) | |
| MIKE McDONALD, Warden, | ) ) | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE FILE |
| Respondent. | ) ) | ORDER DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |
| | ) | |

## PROCEDURAL HISTORY

Petitioner was convicted of two counts of second degree murder (Cal. Pen. Code § 187(a)) for which he was sentenced to two indeterminate terms of fifteen years-to-life and discharging a firearm pursuant to Penal Code § 12022.53(d) for which he was sentenced to two indeterminate terms to 25-years-to-life. (Id.) (Doc. 1, p. 2)

Petitioner appealed to the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed Petitioner's convictions.  (Lodged Document ("LD") 11).   Petitioner then filed a petition for review in the California Supreme Court that was summarily denied.  (LD 12; 13). Petitioner filed a state habeas petition in the Superior Court of Stanislaus County, raising the additional claims of newly discovered evidence of innocence and false evidence.  (LD 14) The court denied the petition. (LD 18).  The California Supreme Court denied Petitioner's subsequent state habeas petition.  (LD 19;

20)

On July 23, 2012, Petitioner filed the instant petition, presenting seven claims for relief.  (Doc. 1). Respondent's answer was filed on October 19, 2012.  (Doc. 12).  On November 6, 2012, Petitioner filed his Traverse.  (Doc. 14).  Respondent contends that a sub-argument in ground one is procedurally barred and that ground six is unexhausted.  (Doc. 12, pp. 30; 44).

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

### Introduction

This double homicide case arose from an abusive domestic relationship between Olivia Valdovinos and Pete Silverio Garcia in the city of Ceres. Valdovinos was a member of the extended Simmons family. Charles Simmons, Sr., and his wife, Carmen Simmons, have a "[v]ery large family." Their children include their only son, Charles Simmons, Jr., and daughters, Elia Sharma, Margaret Janis, and Carmen Gutierrez, among others. Elia Sharma is the mother of appellant Timothy Carrillo and Shankar Sharma, a witness to the homicides. Margaret Janis is the mother of Olivia Valdovinos. Carmen Gutierrez is the mother of Raquel and Erica Baca and nine others. Appellant, Valdovinos, and the Bacas are first cousins. Their other first cousins include Andrea Charles and Angielita Ruiz.

### Testimony of Olivia Valdovinos

In April 2007, Olivia Valdovinos lived at the Almond Terrace Apartments in Stanislaus County with her two children and her boyfriend, Pete Silverio Garcia. At 11:00 p.m. on April 14, 2007, Valdovinos and her cousin, Raquel Baca, took Baca's car and drove to some nightclubs in Modesto. Garcia remained at their apartment with his friend, Cary Lamond Thompson. During the course of the evening, Valdovinos told Baca that she and Garcia had a fight earlier in the evening. The fight concerned Garcia's faithfulness to Valdovinos and Garcia pulled her hair during the altercation. Valdovinos and Baca spent time together at the Timeless nightclub and then separated. When Valdovinos decided to leave the club, she drove Baca's car back to her apartment. She arrived home after 2:00 a.m.

At 3:00 a.m., Baca returned to the apartments to retrieve her car keys. Valdovinos and Garcia had gone to bed, but they got up and began talking with Baca. Baca was angry about Garcia's treatment of Valdovinos and told Garcia he needed to change his behavior. Baca insulted Garcia by calling him names. Valdovinos recognized that Baca was under the influence of alcohol. Garcia initially declined to pay attention to Baca, but he then responded by calling her names. Baca and Garcia cursed each other, and Baca ultimately hit Garcia in the face. Thompson finally got up to keep Baca from "getting in [Pete's] face."

Valdovinos told Garcia and Baca to stop arguing, and she asked Baca to leave the apartment several times. Valdovinos was concerned that Baca was being too loud and that she might awaken the apartment manager. When Baca refused to leave, Valdovinos tried to get Garcia to return to their bedroom. Garcia resisted and told Baca, "'This is going too far.'" Baca angrily replied, "'Oh, you trying to hit me[?] You trying to hit me[?] You think you're bad?'" Baca then told Garcia, "'Watch. I'm going to get my cousin Timmy over here.'"

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

Baca went to retrieve her shoes and Garcia told her, "'Come on Raquel. This is dumb.... I'm a fat guy. You're a pimple face.'" At that point, Valdovinos thought the situation had calmed. However, Baca then gave Garcia an angry look as she walked out the door and said, "'You'll be seeing my cousin and my brother.'" Baca departed, and Valdovinos and Garcia went to their bedroom. Thompson remained on the couch.

Sometime later, Valdovinos heard a knock on a window. Valdovinos was afraid Baca had sent some people over to the apartment, and Valdovinos did not want a scene. She and Garcia walked to the front door of the apartment. The television was still on in the living room. Valdovinos opened the front door and saw her cousin, the appellant, through the security screen door. She saw a few more people at the bottom of the stairs leading to the apartment. She asked appellant to leave, but he asked, "'Where is Pete?'" Valdovinos repeatedly asked appellant to leave and yelled at one point, "'Just leave. You're going to get me kicked out.'" Garcia eventually told appellant, "'Man, Timmy, what?'"

Appellant fired a gun, and Valdovinos dropped to the ground. She saw Garcia shoot back at appellant and then heard a lot of firing. She stayed on the ground and yelled, "'Stop, stop!'" The apartment became quiet and she saw Garcia standing but bleeding. He went toward the kitchen, lied down, told Valdovinos he loved her, and said, "'Tell my mom I love her.'" When Valdovinos told Garcia he was going to be okay, he said that appellant shot him in the heart. Valdovinos immediately called 911. Police arrived a short time later, and Valdovinos claimed she was the one who shot appellant because she knew Garcia was not supposed to be in possession of a firearm. Valdovinos admitted a conviction for petty theft on June 8, 2004.

**Testimony of Nancy Chavez**

Nancy Chavez, landlord of the Almond Terrace Apartments, lived directly below the apartment of Valdovinos and Garcia. Chavez was awakened during the early morning hours of April 15, 2007, by the sound of gunshots. Chavez looked outside her window and saw three large men. One of the men jumped from a second-floor stairwell to ground level. Chavez saw the trio leave out the Evans Road exit to the gated complex and she called 911. Chavez's roommate, Manuel Luna, heard four or five gunshots. He went upstairs and held a towel to Garcia's wound. Luna said Valdovinos appeared to be in complete shock, and Luna assisted her. Luna said he saw Thompson with his head lying on the couch and his feet placed toward the left of the couch.

**Testimony of Sergeant Jose Berber**

Ceres Police Sergeant Jose Berber arrived at the scene and found Garcia gasping for air and experiencing pain. Garcia walked toward Berber and fell to the ground on the landing outside the apartment. Valdovinos cradled Garcia in her arms. Sergeant Berber entered the apartment and found a plastic-gripped, white metal revolver in the doorway. Ceres Police Officer Brian Ferreira said a light was on inside the apartment.

Sergeant Berber gave Garcia CPR until paramedics arrived at the scene. Berber said Garcia was a large man who weighed more than 300 pounds. Sergeant Berber watched as Garcia expired and then asked Valdovinos who had shot him. She said, "'It was my cousin. It was my cousin. I can't believe he did this.'" She told Berber her cousin's name was Timothy Carrillo and said that he and his brother had been at the apartment. At 4:00 a.m., appellant entered station one of the Ceres Fire Department and contacted paramedic Julian Bordona. Appellant had sustained two gunshot wounds but declined to identify himself to Bordona.

**Testimony of Criminalist Jennai Lawson**

Jennai Lawson, a criminalist with the California Department of Justice Crime Laboratory in Ripon, testified she discovered a bullet hole in the upper left portion of the security door on Valdovinos's apartment. She concluded the bullet hole had been made by someone firing inside

the door toward the exterior of the apartment. Lawson examined a Rossi revolver found in the entry to the Valdovinos/Garcia apartment at Almond Terrace. The revolver contained five expended cartridges, and Lawson believed one of the bullets from that firearm had been fired through the security door. Lawson traced the trajectory of a bullet fired by someone from outside the apartment. That bullet traveled through the left side of the front door. Cary Thompson's body was still in the apartment when Lawson arrived. Lawson determined a bullet passed through the apartment loveseat and hit Thompson in the chest. In Lawson's opinion, the person who shot the bullet stood very close to the front door or entry way or stood inside the apartment. Based on the wounds to Garcia and the bullets she saw at the scene, Lawson believed appellant fired at least four bullets.

**Testimony of Dr. Robert D. Lawrence**

Robert D. Lawrence, M.D., a forensic pathologist, testified he performed autopsies on both Thompson and Garcia. Dr. Lawrence found two gunshot wounds in Thompson's chest. One wound was located on the right side of the breast bone and the second wound was located further down on the right side. The first wound had an atypical entrance, with an abrasion collar suggesting that the bullet might have struck something before entering Thompson's body. Dr. Lawrence detected a piece of foam rubber inside the first bullet hole. Dr. Lawrence found no gunshot residue around either of the bullets, indicating the shots were not made a close range. Dr. Lawrence said Garcia sustained a single gunshot wound to his chest near the midline. Both victims died from shock and hemorrhage due to penetrating gunshot wounds to their chests. Dr. Lawrence said Thompson had a blood-alcohol level of 0.27 and methamphetamine in his blood. Dr. Lawrence said Garcia had a blood-alcohol level of 0.21.

**Testimony of District Attorney Investigator Froilan Mariscal**

Froilan Mariscal, an investigator with the Stanislaus County District Attorney's Office, said he assisted in the execution of a search warrant at appellant's residence on Don Pedro Road in Ceres. Mariscal found a loaded .38–caliber Smith & Wesson six-shot revolver inside a bag in a small closet. Mariscal gave the weapon to Detective Griebel of the Ceres Police Department.

**Testimony of Criminalist Scott Bauer**

Scott Bauer, a senior criminalist with the California Department of Justice Crime Laboratory, testified he examined three bullets removed from the bodies of the victims and one bullet removed from the crime scene. He determined the bullets were not fired from the Rossi revolver recovered by criminalist Lawson at the apartment. Bauer could not determine whether the bullets were fired from the Smith & Wesson revolver recovered at appellant's apartment. In fact, Bauer expressed the opinion that the bullets were most likely not fired from the Smith & Wesson. He explained, "[A]gain, I couldn't eliminate it or identify it but in my opinion most likely not."

**Defense Evidence**

**Appellant's Medical Report**

On motion of the defense, the court admitted into evidence a three-page Doctor's Medical Center report, dated December 10, 2008, concerning appellant's physical condition.

**Testimony of Raquel Baca**

Raquel Baca testified that Olivia Valdovinos had sustained multiple injuries during the 18 months she had dated Garcia. At 10:00 p.m. on April 14, 2007, Baca, Valdovinos, and Baca's cousin, Andrea Charles, went out together to some bars. Baca said she later returned to Valdovinos's apartment to retrieve her house and car keys. Baca said she had a clear view of

4

Valdovinos's apartment because she lived in apartment No. 6, downstairs from Valdovinos's unit.

When Baca reached Valdovinos's apartment, Garcia and Thompson were in the living room. Garcia offered Baca some pizza. Because Garcia was dressed in his boxer shorts, Valdovinos instructed him to go in the bedroom and put on some pants. When Garcia left the living room to dress, Valdovinos told Baca that he had just pulled her hair and hit her. Garcia then returned to the kitchen and Baca told him he should respect Valdovinos. Baca and Garcia got into a heated argument and struck one another in the face.

Baca was upset as she departed Valdovinos's apartment. She stopped at appellant's home, told him that Garcia had hit her, and also told him about Valdovinos's claims of abuse at the hands of Garcia. Baca stayed at appellant's home for about 30 minutes and then went back to her first-floor apartment. At some point she heard appellant tell Valdovinos that he wanted to speak with Garcia. Appellant was standing by the window to the left of the front door of Garcia's apartment. Appellant told Valdovinos, "[I]f he [Garcia] wants to be hitting girls, he should come out and fight like a man." Valdovinos told appellant to leave, the area in front of her apartment got quiet, and Valdovinos closed the security door to the apartment.

Baca next saw Garcia put his head outside the security door, come back inside, and then extend his arm out and start firing a handgun. Baca said Garcia fired at least four or five shots, and appellant leaned back against the wall and returned the fire inside the apartment. She testified she heard the gunshots fired by appellant but did not necessarily see any flashes from a weapon. Baca confirmed the last shots were fired by appellant. She saw appellant run down the stairwell. Baca then called 911 and reported the shooting. Baca heard Valdovinos yell, "'Get an ambulance here.'" After seeing the police and paramedics arrive at the scene, Baca then left and went to her mother's home.

**Testimony of Shankar Sharma**

Appellant's half brother, Shankar Sharma, knew both Valdovinos and Garcia and noticed that Valdovinos sustained bruises to her face on several occasions during their relationship. During the early morning hours of April 15, 2007, Sharma was at appellant's home with appellant, cousin Robert Garcia, and friend Lorenzo Martinez. Sharma and the others were drinking beer when Raquel Baca arrived at appellant's home. Baca was crying, said Valdovinos and Garcia had gotten into an argument, and said that Garcia had hit and pulled the hair of Valdovinos and hit Baca herself. After Baca departed, appellant, Sharma, and the others present decided to go check on Valdovinos. The quartet proceeded to the Valdovinos's apartment in appellant's van. The gate to the complex was closed but unlocked.

Appellant knocked on the window to the right of the apartment door and Valdovinos answered. When appellant asked whether she was okay and whether Garcia was hitting her again, Valdovinos asked several times for appellant to leave the premises. Appellant eventually challenged Garcia to a fight, and Garcia opened the door and fired several shots at appellant. Sharma described Garcia's weapon as a silver revolver. Appellant produced a gun and returned the fire, sustaining a wound during the exchange. Sharma heard six or seven shots altogether. Appellant, Sharma, and the two companions returned to appellant's van and proceeded to the Ceres Fire Department to get medical care for appellant. Sharma said the gate to the apartment complex was open, so they were able to enter and depart without using a code. Sharma said Garcia had a reputation in the Sharma/Carrillo family for being a Norteno criminal street gang member who carried guns.

**Testimony of Lorenzo Martinez**

Lorenzo Martinez testified he was at appellant's home during the early morning hours of April 15, 2007. Martinez, appellant, and several others were relaxing, drinking beer, and playing

video games. Raquel Baca arrived and spoke with appellant. She was crying and her face was red and puffy. Raquel said Pete Garcia slapped her in the face and made a red mark. She also said Garcia hit Valdovinos. She stayed five to eight minutes and then departed. Appellant, Martinez, and their two companions—Robert Lopez and Shankar Sharma—decided to go to Garcia's apartment and check on Valdovinos. Martinez understood the purpose of the visit was to have a fist fight with Garcia and stop him from hitting Valdovinos. The quartet drove appellant's vehicle to the Almond Terrace Apartments, entered through the unlocked gate, and walked to the front door of the second-floor apartment.

Appellant knocked on the kitchen window and the security door of the apartment. Valdovinos spoke through the door, and appellant asked whether she was all right. Appellant asked to speak with Garcia. Appellant said, "'Come outside and fight a real man. Quit hitting on a girl.'" Garcia came to the door, spoke briefly with appellant, and said he would be right back. When Garcia returned, he opened the door, stepped outside, and fired several rounds at appellant. Appellant pulled out a gun and exchanged fire with Garcia. Appellant sustained a wound to his side and eventually obtained treatment at Memorial Medical Center. Robert Lopez, the nephew of Raquel Baca, confirmed Lorenzo Martinez's version of events. Lopez said he and Martinez drove appellant to the Ceres Fire Department and dropped him off there. They then drove back to appellant's home and parked the car there.

**Testimony of Detective Mark Neri**

Ceres Detective Mark Neri interviewed Raquel Baca on April 20, 2007, at the Ceres Police Department. Baca gave Neri a detailed chronology of events beginning with the 10:00 p.m. hour on Saturday, April 14, 2007. Baca described a confrontation with Garcia after she and Valdovinos had visited a number of nightclubs. Baca said she encouraged Garcia to show Valdovinos more respect, and Garcia became angry because she was telling him how to treat her cousin. During the recorded interview, Baca denied telling Garcia, "I'm going to get my cousin, Tim, to beat your ass."

At trial, Baca said she did not give Detective Neri complete information during the interview because she omitted the fact that Sharma, Martinez, and Lopez were present when she visited appellant's home after the confrontation with Garcia. Detective Neri testified he conducted a tape-recorded interview with Valdovinos on the morning of April 15, 2007, at the Ceres police station. After Neri took that statement, he called Valdovinos back for another recorded statement. In the first statement, Valdovinos said Garcia was standing directly behind her in the apartment before shots were fired. In the second statement, Valdovinos said Garcia was standing to her left. In the second statement, Valdovinos claimed that Raquel Baca told Garcia as she departed their apartment, "[Y]ou will be seeing my cousin and my brother...."

**Testimony of Andrea Charles**

Andrea Charles, a cousin of appellant and Valdovinos, testified she lived with Valdovinos for three months beginning in December 2006. Charles saw Valdovinos with injuries on six or seven occasions. The injuries included black eyes and a "busted lip." Charles knew Garcia as her cousin's boyfriend and knew he carried a gun. Charles spent part of the evening of April 14, 2007, with Valdovinos and Baca but ended up spending the night with friends rather than returning to the Almond Terrace apartment.

**Testimony of Angielita Ruiz**

Angielita Ruiz, another cousin of appellant and Valdovinos, testified that Garcia and Valdovinos dated for about a year and one-half, and that Valdovinos sustained a busted lip, black eyes, and bruised arms on different occasions during that relationship. Ruiz saw appellant in possession of a gun "lots of times." In January 2007, Ruiz stayed with Valdovinos and Garcia. Ruiz was awakened by the sound of Valdovinos screaming. She went to Valdovinos's

room and saw Garcia with a gun in his left hand. Garcia attempted to pick up Valdovinos with his right hand and throw her out a window. Ruiz intervened and Garcia pulled the gun out, cocked the trigger, and placed it at the side of her head. On another occasion in January 2007, Ruiz intervened when Garcia held a gun in one hand and hit Valdovinos's head with his other hand.

**Testimony of Mary Helen Gomez**

Mary Helen Gomez, an aunt of appellant and Valdovinos, testified that Valdovinos sustained black-and-blue eyes and a "busted" bottom lip at the hands of Garcia about four months before the events of April 14, 2007.

**Testimony of Sanjuana Vasquez**

Sanjuana Vasquez testified she resided in the apartment to the south (or left) of the apartment occupied by Valdovinos and Garcia. She heard the sound of rapid shots and an explosion coming from the latter apartment around 4:00 a.m. on April 15, 2007. She stood up and saw four men leaving the second floor apartment. One of the men jumped off the balcony. The four men departed in a northerly direction.

**Testimony of Margaret E. Janis**

Margaret E. Janis testified she was the mother of Olivia Valdovinos and the aunt of the appellant. Janis said she spoke to her daughter many times about the April 15 incident, and Valdovinos consistently said she did not know who fired first. Janis also said appellant acted as a protector of the females in their family and was not afraid of engaging in an altercation with someone who was abusing a female member of their family. Charles Cahoone, a private defense investigator, testified he interviewed Margaret Janis after the April 15 incident. According to Janis, Valdovinos knew that bullets were flying over her head but did not know who fired the first shot.

**Testimony of Carmen Gutierrez**

Carmen Gutierrez testified she was the mother of Raquel Baca and the aunt of appellant. Gutierrez said Baca came to her home during the early morning hours of April 15. Gutierrez was asleep at the time. When she awakened, Baca explained what had happened at the Almond Terrace Apartments. Gutierrez first went to the hospital and then went to Valdovinos's apartment. Gutierrez saw Valdovinos in a police car at the complex. Gutierrez asked Valdovinos why she was in the police car, and Valdovinos said she told officers she had shot appellant. Valdovinos said she lied to protect Garcia, who had a pending case for shooting someone else. At some unspecified point in time, Valdovinos called Gutierrez from the Ceres Police Department to get a ride. Gutierrez picked her up and said she was "real upset" because she had learned that Garcia had passed away. According to Gutierrez, Valdovinos hated appellant because of what happened and wished that he had died also.

**Testimony of Erica Baca**

Erica Baca testified she was the sister of Raquel and the cousin of appellant and Valdovinos. According to Erica, Valdovinos told detectives that she shot appellant because Garcia was fighting a gun charge, and she did not want him to go to prison for 15 years. Valdovinos told Erica she did not know who fired the first shot at the apartment.

**Testimony of Albanita Erebia**

Albanita Erebia testified she visited with Valdovinos and Margaret Janis at the home of Erebia's aunt and uncle by marriage, Mr. and Mrs. Charles Simmons, Jr. The visit took place right after

7

the shooting in the early morning hours of April 15, 2007. Valdovinos said an argument occurred between her cousin and her husband and "after that everything happened so quickly and there were just bullets everywhere." Valdovinos referred to Garcia as her husband and said he was dead. Erebia asked who shot first and Valdovinos said she did not know because "[i]t all happened so fast, and it was just bullets were everywhere." Valdovinos also told Erebia that she dropped to the floor when the bullets were discharged.

**Testimony of Charles Simmons, Jr.**

Sacramento County resident Charles Simmons, Jr., testified he was the uncle of appellant, Erica and Raquel Baca, and Valdovinos. Simmons said he and other family members met twice with Valdovinos at his home. Albanita Erebia was present during the second such meeting. During each of those meetings, Simmons said family members "were upset because they had seen Olivia with "busted lips," black eyes, and bruises and in some cases had witnessed the infliction of those injuries. Family members expressed to Simmons their concern that Valdovinos was being untruthful about the cause of her injuries. During these conversations, Valdovinos said she did not see who shot first at her apartment.

Valdovinos told her family members that she had said the same thing to police detectives. Simmons said Valdovinos had sustained very serious spousal abuse at the hands of her former husband, Condalario Valdovinos. The abuse required her to be hospitalized and to have her jaw wired shut. In March 2007, Valdovinos arrived at her grandparents' home in Modesto. She had "a busted lip" with hanging skin and a swollen cheek.

Valdovinos had a handgun in her purse on that occasion and she said she wanted to use it to shoot Garcia. Simmons retained possession of the gun for one week and then returned it to Valdovinos. Garcia ran away after breaking Valdovinos's jaw and was caught and arrested about a year later. Valdovinos married Garcia while he was in jail. Simmons confirmed that family members Andrea Charles and Angie Ruiz actually witnessed Garcia striking Valdovinos on at least one occasion. Simmons did not consider Valdovinos a truthful person because through the years she had denied being a victim of domestic abuse.

**Testimony of Carmen D. Simmons**

Carmen D. Simmons, grandmother of appellant and Valdovinos, said she and her husband, Charles Simmons, Sr., temporarily moved to the Sacramento home of their son, Charles Simmons, Jr., shortly after the shooting. Within a week of the shooting, Carmen Simmons, Charles Simmons, Sr., Charles Simmons, Jr., Margaret Janis, and Olivia Valdovinos all met at the home of Charles, Jr. and talked about the shooting. Carmen Simmons said Valdovinos did not remember who shot first.

**Testimony of Dr. Linda Barnard**

Linda Barnard, Ph.D., a licensed marriage and family therapist in private practice, testified "there were multiple generations of intimate partner battering" in Valdovinos's extended family. Dr. Barnard said Valdovinos had been the victim of serious intimate partner battering starting at the age of 15. Valdovinos's first husband beat her so badly that she had to have her face reconstructed. Her relationship with Pete Garcia resulted in serious injuries from domestic violence. Dr. Barnard testified that battered women have a tendency to minimize and deny the extent of violence the experience, particularly if they stay with their partner. Dr. Barnard also said that 75 to 80 percent of women who initially report domestic violence to law enforcement either recant or become uncooperative with authorities at some point in the process. Dr. Barnard said Valdovinos had a history of recanting, minimizing, or denying intimate partner battering and also said Valdovinos's statements to police after the shooting were the result of intimate partner battering, including her minimization of "any kind of involvement of domestic violence by Pete [Garcia]." Dr. Barnard considered Garcia a high-level batterer.

8

Dr. Barnard testified that Charles Simmons, Jr., was the only male of his generation, and he acted as a protector of all of his sisters and intervened when they or their daughters were subjected to abuse. Simmons told Dr. Barnard that appellant assisted him in that role because appellant was "part of that older group of the next generation...." According to Barnard, Simmons said appellant "became the go-to guy for girls in his generation ... who came to him for help when boyfriends were hurting them or they were having problems and asked him to help or intervene so he took on that same role Uncle Charles had." Dr. Barnard was aware that appellant had been convicted of a misdemeanor battery on his own spouse in 2003 and attended a 52–week batterer intervention program as a result. Simmons said the intervention program caused appellant to mature and make changes in his own life.

**Testimony of Officer Gary Soria**

California Highway Patrol Officer Gary Soria testified he went to a traffic stop north of Paradise Road on Martin Luther King Boulevard on August 29, 2003. Officer Soria assisted in a search of Pete Garcia, who sat in the right front seat of the detained vehicle. Soria located a loaded magazine for a weapon in Garcia's pants pocket.

**Testimony of Officer Robert Gumm**

Modesto Police Officer Robert Gumm testified he ejected Garcia from the X–Fest festival in downtown Modesto on the evening of July 23, 2005, because Garcia was making gestures for Westside, part of the Norteno criminal street gang.

**Testimony of Deputy Paul Teso**

Stanislaus County Deputy Sheriff Paul Teso testified that Garcia was a self-admitted member of the Norteno criminal street gang effective December 8, 2006.

**Testimony of Olivia Valdovinos**

Olivia Valdovinos testified that Pete Garcia never held a gun to her head, never attempted to push her out of a second-floor window, and never carried a gun in her purse to help Garcia avoid trouble. She said she carried a gun in her purse because she wanted to and denied that her uncle, Charles Simmons, Jr., took that gun away from her. Valdovinos said she did not know who fired first during the shooting at her apartment.

With respect to events after the shooting, Valdovinos admitted talking to her uncle, Charles, Jr., several times about getting some money from appellant's father as an apparent inducement for her not to testify against appellant. She said the first such conversation with her uncle occurred at her grandfather's house prior to trial. The second such conversation with her uncle took place over the telephone and the conversation was recorded. According to a transcript of the recording, Valdovinos said she had already spoken with appellant's father. During that same recorded telephone call with Charles, Jr., appellant agreed to take $15,000 down and an additional sum later. At trial, however, Valdovinos said she never followed through with the proposed inducement and also said she reported "the conversation" to the district attorney's office before trial.

**Related Testimony of Charles Simmons, Jr.**

Charles Simmons, Jr., testified he spoke with Valdovinos in Modesto on June 8, 2009, and she asked what did appellant's father "have for her not to show up." Valdovinos did not mention a specific dollar amount but did mention that she had a pending $5,000 cleanup bill for her apartment. Valdovinos told Simmons she would not show up in court and testify in return for whatever appellant's father had.

9

During a telephone call with Simmons, Valdovinos said she would take $15,000 up front as long as she received $5,000 later on. Investigator Charles Cahoone was present during Simmons's speakerphone conversation with Valdovinos. According to Cahoone, "Olivia asked if he [Simmons] had spoke[n] to big Tim [appellant's father], and she said if they were still willing to do it [pay her hush money], that she would not go to jail for not testifying because of the law against not testifying against relatives."

**Testimony of Erica Baca**

Erica Baca testified that Valdovinos had spoken to her about Garcia putting a gun to her head and attempting to push her out of a window. Baca also said that she and Valdovinos had talked about the trial. According to Baca, "she [Valdovinos] told me if certain issues came up in court, she was going to lie about them."

**Testimony of Sergeant Craig Breckenridge**

Modesto Police Sergeant Craig Breckenridge testified he arrested Garcia for being in possession of a loaded firearm on the evening of September 1, 2000. The arrest occurred during a traffic stop, and Garcia was seated in the rear passenger seat behind the driver. A fellow officer told Sergeant Breckenridge the location of the weapons. Garcia denied ownership, and the driver of the vehicle claimed that one of the weapons belonged to his cousin.

**Rebuttal Evidence**

**Testimony of Shankar Sharma, Lorenzo Martinez, and Robert Lopez**

Shankar Sharma testified he did not see what happened to appellant's gun after the shooting. Lorenzo Martinez testified he saw appellant fire the weapon but did not see it again after the shooting. Robert Lopez testified he never saw appellant with a gun and never saw him fire a weapon.

**Testimony of Margaret Janis**

Margaret Janis testified that she visited her daughter, Valdovinos, and Pete Garcia once or twice a week at the Almond Terrace Apartments. On one occasion, she saw Valdovinos with a black eye, but Valdovinos said she incurred the injury when she got into a fight at a club. Janis did not recall seeing her daughter with "a busted lip." However, she did remember her daughter saying she had injured herself in bar fights on several occasions. Janis did not know that appellant had been convicted of a battery on his wife in 2003 or that he had grabbed his stepmother's neck and pulled her hair in December 2003.

**Testimony of Defense Investigator Charles Cahoone**

Defense investigator Charles Cahoone interviewed Sharma on January 7, 2009. Sharma told him he heard Garcia say, "Watch out," open the security screen door, stick his right foot and hand out of the door, and hold a chrome revolver in his hand. Sharma told Cahoone that appellant then stepped in front of Sharma, and Garcia shot at appellant. Sharma saw a flash from the muzzle of a gun and ran toward the balcony railing. At the railing, Sharma looked back and saw appellant return shots into the apartment. Cahoone interviewed Lorenzo Martinez and Robert Lopez that same date and Martinez and Lopez offered similar versions of the events surrounding the shooting.

(Doc. 12, Ex. A, pp. 1-11).

**<u>DISCUSSION</u>**

10

I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether

it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

### III.  Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief: (1) use of CALCRIM No. 3475 was erroneous; (2) use of a jury instruction regarding provocation of a fist fight was erroneous; (3) erroneous use of instruction regarding consciousness of guilt from flight; (4) reversible evidentiary error; (5) erroneous exclusion of evidence; (6) newly discovered evidence of innocence; and (7) ineffective assistance of counsel.

A.  <u>CALCRIM No. 3475</u>

Petitioner first contends that the trial court erred in instructing the jury with CALCRIM No. 3475.  This contention is without merit.

1. <u>The 5th DCA's Opinion.</u>

The 5th DCA rejected Petitioner's claim as follows:

Appellant contends the court eliminated his claim of right of self-defense and denied him due process by giving CALCRIM No. 3475 [right to eject trespasser from real property]. While we will address appellant's numerous primary and subsidiary contentions, we note the issues of trespass and defense of real property were not at the heart of this case. We further note that appellant's single-minded emphasis on the concept of trespass and the giving of CALCRIM No. 3475 overlooks our responsibility to assess the correctness and adequacy of jury instructions by a consideration of the entire charge, rather than by reference to parts of an instruction or from a particular instruction. (<u>People v. Holt</u> (1997) 15 Cal.4th 619, 677; <u>People v. Smithey</u> (1999) 20 Cal.4th 936, 963–964.)

A. Background

During the jury instruction conference, the court referred to CALCRIM No. 3475, which he described as dealing "with the right to eject a trespasser from real property."  The court said the instruction is normally used "when someone is charged with a crime that is ejecting someone from the property."  Defense counsel opposed the giving of CALCRIM No. 3475.  Counsel acknowledged "[t]he right to use deadly force inside your home when somebody invades it...."  However, he pointed out that appellant yelled at Garcia and did not move toward or open the apartment door. The prosecution maintained that appellant demanded a confrontation with Garcia. The prosecution conceded, "[T]hat may not now allow the enjoyment of firing the gun, but it may allow the response of saying I have a deadly weapon. Get out of here."  The court noted that CALCRIM No. 3475 did not specifically mention the use of deadly force.  Rather, the instruction mentioned reasonable force and the court elected to give the instruction over defense objection.

B. The Instruction

At the apparent request of the prosecution, the court subsequently instructed the jury in CALCRIM No. 3475, as follows:

"A lawful occupant of a home may request that a trespasser leave the home. If the trespasser does not leave within a reasonable time and it appears to a reasonable person that the trespasser poses a threat to the home or the occupants, the lawful occupant may use reasonable force to make a trespasser leave. A reasonable force means the amount of

force that a reasonable person in the same situation would believe is necessary to make the trespasser leave.

"In deciding whether Pete Garcia used reasonable force, consider all the circumstances as they were known to him and appeared to him and consider whether a reasonable person in a similar situation with similar knowledge would have believed."

## C. The Arguments of Counsel

During his opening argument, the prosecutor acknowledged that appellant and his companions gained access to the Almond Terrace Apartments through the pedestrian gate. The prosecutor pointed out that appellant's companions could not "decide if it was open, closed, or unlocked, but clearly they opened it up and got in" during the early morning hours of April 15, 2007.  The prosecutor referred to appellant as a trespasser who went to Garcia's residence at 4:00 a.m. and noted "there's an instruction on the rights of someone who, you know, protect themselves [sic] against this kind of conduct."  In his responsive argument, defense counsel acknowledged that appellant called Garcia out but did not make any attempt to enter the apartment, even when the screen door was open. Defense counsel further acknowledged:  "So wh[ile] you have the right to reject [a] trespasser, you don't have the right to use unreasonable force, and assaulting him with a deadly weapon is unreasonable force."  The prosecutor argued on rebuttal that Garcia and appellant were not similarly situated because one was a homeowner and the other was an intruder.  He maintained Garcia was in his home, was threatened by appellant, and had the right of self-defense.

## D. Appellant's Contention

Appellant broadly argues that CALCRIM No. 3475 labeled him a "trespasser," justified Garcia's use of reasonable force to make appellant leave his residence, and eliminated appellant's "meritorious claim of self-defense, in violation of due process."
Appellant goes on to argue, among other things, that (1) CALCRIM No. 3475 "was a burden shifting instruction in violation of due process;" (2) the inference that appellant was a trespasser was unfounded; (3) the evidence was "legally insufficient to establish that appellant was a trespasser, although it was enough to mislead the jury;" (4) the prosecutor's argument distorted the instruction, resulting in a denial of due process; and (5) the instruction misled the jury on the principles of self-defense in violation of appellant's right to due process.

## E. Analysis

### 1. General Law of Instructional Error

If a trial court's instructional error violates the United States Constitution, the standard stated in Chapman v. California (1967) 386 U.S. 18, 24, requires the People, in order to avoid reversal of the judgment, to "prove beyond a reasonable doubt that the error ... did not contribute to the verdict obtained."  (See People v. Simon (1995) 9 Cal.4th 493, 506, fn. 11 (Simon).)  But if a trial court's instructional error violates only California law, the standard is that stated in People v. Watson (1956) 46 Cal.2d 818, 836, which permits the People to avoid reversal unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (Simon, supra, 9 Cal.4th at p. 506, fn. 11; see also People v. Mower (2002) 28 Cal.4th 457, 484.)

### 2. Validity of CALCRIM No. 3475 and Alleged Shifting of the Burden of Proof

CALCRIM No. 3475 does not specifically address or allocate the burden of proof. As to the burden of proof, the trial court initially instructed the jury in CALCRIM No. 103 [reasonable doubt]: "A defendant in a criminal case is presumed to be [innocent]. This presumption requires that the People prove the defendant guilty beyond a reasonable doubt. Whenever I tell you the

People must prove something, I mean they must prove it beyond a reasonable doubt."  The court went on to instruct the jury in CALCRIM No. 505 [justifiable homicide; self-defense or defense of another] in pertinent part as follows:

> "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if:

> "One, the defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;

> "Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

> "And, three, the defendant used no more force than reasonably necessary to defendant against that danger. [¶] ... [¶]

> "The defendant's belief that he or someone else was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably had believed the information was true. If you find that the defendant knew that Peter Silverio Garcia had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

> "A defendant is not required to retreat. He ... or she is entitled to stand his or her ground and defend himself or herself and if reasonably necessary pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating. Great bodily injury and significant or substantial injury, it is injury that is greater than minor or moderate harm.

> "The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If they have not met this burden, you must find the defendant not guilty of murder or manslaughter.

> "When the original aggressor is not guilty of a deadly attack but of simple assault or trespass, the victim has no right to use deadly or other excessive force. If the victim uses such force, the aggressor's right of self-defense arises.

> "If, however, the counterassault be so sudden and perilous that no opportunities be given to decline or make known to his adversary of his willingness to decline or make known to the adversary of his willingness to decline to strike if he cannot retreat with safety, then the greater wrong of the deadly assault is upon the opponent, he would be justified in ... slaying forthwith in self-defense"

"In reviewing claims of instructional error, we look to whether the defendant has shown a reasonable likelihood that the jury, considering the instruction complained of in the context of the instructions as a whole and not in isolation, understood that instruction in a manner that violated his constitutional rights. [Citations.] We interpret the instructions so as to support the judgment if they are reasonably susceptible to such interpretation, and we presume jurors can understand and correlate all instructions given. [Citations.]"  (People v. Vang (2009) 171 Cal.App.4th 1120, 1129.)  Here, references in CALCRIM No. 3475 to appellant's status as an alleged trespasser or Pete Garcia's alleged use of reasonable force were complemented and clarified by the principles of justifiable homicide and the relevant burden of proof as set forth in CALCRIM No. 505.

In asserting a shift in the burden of proof, appellant acknowledges People v. Watie (2002) 100

Cal.App.4th 866 (<u>Watie</u>), a factually similar case in which the Third Appellate District upheld the use of CALJIC Nos. 5.40 and 5.42, predecessor instructions to CALCRIM No. 3475. In <u>Watie</u>, the defendant's mother lived with his abusive stepfather, an ex-felon, and several stepsiblings. On May 5, 1999, the defendant's stepfather assaulted his mother during a fight at their home and she sustained a bloody face. The defendant saw his mother after the fight and he told her to call the police. She called 911 about an hour later and said the stepfather had no weapons in the house. A police officer responded to the scene and the defendant's mother told him she had been the victim of domestic violence. The mother did not go to the hospital or file charges against the stepfather. (<u>Id</u>. at p. 871–873.)

The defendant offered to pick up his stepsiblings. He put a gun in his back pocket, took two friends, and went to his mother's home. After a heated conversation, the stepfather challenged the defendant to a fight. The stepfather then went to the back of the house, and the defendant thought he was going to get the stepsiblings. The stepfather returned with what the defendant thought to be a rifle or shotgun and defendant shot him dead with the concealed handgun. Emergency personnel and police officers responding to the scene found a wooden object underneath the stepfather's body but no firearm. The defendant was charged with second degree murder with personal use of a firearm (§§ 187, subd. (a), 12022.5, subd. (a)(1)) and discharging a firearm in an inhabited dwelling (§ 246). As to both substantive counts, the Sacramento County District Attorney charged the defendant with personal discharge of a firearm causing great bodily injury (§ 12022 .53, subd. (d)). A jury found him guilty of the lesser included offense of voluntary manslaughter (§ 192) and guilty of all of the charged offenses and allegations. (<u>Watie, supra</u>, 100 Cal.App.4th at pp. 873–875.)

The defendant appealed contending the court erroneously gave CALJIC No. 5.40 [defense of property—ejection of trespasser] and No. 5.42 [resisting an intruder upon one's property]. He claimed the trial court erroneously failed to inform the jury that self-defense instructions applied to the section 246 charge, failed to explain the malice element required to convict for a violation of section 246, and failed to give a mistake-of-fact instruction to the jury. The Third District Court of Appeal rejected these contentions and affirmed. The defendant claimed CALJIC Nos. 5.40 and 5.42 should not have been given to the jury because these instructions allowed jurors to presume the stepfather was acting in lawful defense of his property and effectively removed the defense of actual self-defense from the jury's consideration. (<u>Watie, supra</u>, 100 Cal.App.4th at pp. 875–876.)

The Third District held the instructions were proper in light of the facts of the case. The justification of self-defense requires a double showing: that the defendant was actually in fear of his life or serious bodily injury and the conduct of the other party was such as to produce that state of mind in a reasonable person. Generally, if one makes a felonious assault upon another, or has created appearances justifying the other to launch a deadly counterattack in self-defense, the original assailant cannot slay his adversary in self-defense unless he or she has first, in good faith, declined further combat, and second, has fairly notified the adversary that he or she has abandoned the combat. In addition to the instructions that generally describe self-defense, the court instructed the jury on the defense of a dwelling, using CALJIC Nos. 5.40 and 5.42. The right of a victim to defend himself and his property is a relevant consideration in determining whether a defendant may prevail when he or she seeks to negate malice aforethought by asserting the affirmative defense of imperfect self-defense. (<u>Watie, supra</u>, 100 Cal.App.4th at pp. 877–879.)

In <u>Watie</u>, the jury was confronted with two questions: (1) whether the defendant's use of deadly force was justified as he confronted his stepfather on the front porch of the latter's home and (2) whether the defendant's unlawful conduct created circumstances that legally justified the stepfather's use of force. According to the Third District, if the stepfather had a right to use force to defend himself in his home, then the defendant had no right of self-defense, imperfect or otherwise. The trial court's instructions on the stepfather's rights and the defendant's right to turn to deadly force correctly stated the law. The Third District further noted that the jury apparently credited the defendant's claim of self-defense by finding the defendant guilty of the lesser

offense of voluntary manslaughter. To do so, the jury must have found that the defendant had, or regained, the right to defend himself notwithstanding his stepfather's right to defend his home. The Third District concluded the challenged instructions did not bear on the jury's verdicts. (Watie, supra, 100 Cal.App.4th at pp. 878–879.)

Appellant claims Watie is inapplicable to the facts of this case because "the defendant in Watie was properly deemed to be a trespasser" while in this case, "[a]ppellant was not a trespasser." Our reading of Watie does not reveal any specific discussion of the crime or concept of trespass, although the Third District stated without citing to authority: "Moreover, defendant was guilty of trespass and was threatening [the stepfather] whether defendant was attempting to break into the house or not."(Watie, supra, 100 Cal.App.4th at p. 879.)  In fact, appellant ultimately concedes in his opening brief: "Although the subject was not discussed in the Watie opinion, the defendant was clearly deemed to be a trespasser...."  Cases are not authority for propositions not considered. (People v. Nguyen (2000) 22 Cal.4th 872, 879.)  Appellant's claim that the decision in Watie turned on the defendant's status as a trespasser at the home of his mother and stepfather is questionable. The use of CALCRIM No. 3475 in this case was consistent with the use of its predecessor instructions, CALJIC Nos. 5.40 and 5.42, in Watie.

Even if CALCRIM No. 3475 somehow implied that appellant was a trespasser at the Almond Terrace Apartments, CALCRIM No. 505 protected his due process rights by fully and fairly setting forth the concepts of lawful self-defense and defense of another.

2. Inference of Appellant as Trespasser
Appellant contends the inference that he was a trespasser was unfounded because there was no jury instruction defining the term "trespasser." Neither CALCRIM No. 3475 nor former CALJIC No. 5.40, upon which appellant relies, sets forth a specific definition of the term "trespasser." As respondent points out, a technical definition of "trespasser" was not required since appellant was not being prosecuted for trespass. In addition, the court instructed the jury in CALCRIM No. 200 that: "Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

Appellant implies he was not a trespasser in common parlance because Almond Terrace resident "Raquel [Baca] at least impliedly (if not explicitly) invited appellant to enter the apartment complex."  On direct examination during the People's case-in-chief, Valdovinos said Raquel and Garcia got into an argument at their apartment after Raquel returned from drinking. Garcia eventually told Raquel, "'Come on, Raquel. This is going too far.'"  According to Valdovinos, Raquel replied, "'Oh, you trying to hit me? You trying to hit me?  You think you're bad?... Watch. I'm going to get my cousin Timmy over here.'"  On direct examination during the defense case, defense counsel specifically asked Raquel Baca, "Did you ask him [appellant] to go over to Olivia's apartment and beat up on Pete?" Baca replied, "No." On direct examination during the defense case, defense counsel asked Shankar Sharma about the events leading to the shooting. Sharma said they arrived at Valdovinos's apartment and appellant knocked on the window. When Valdovinos answered the door, appellant asked, "'Are you okay?'"  Valdovinos responded, "'Timmy, what are you doing here? Why are you [here]?'"  When appellant asked whether Garcia was still hitting her, she replied, "'No, just get out of here.'"

The totality of the testimony was conflicting, at best. Nevertheless, we do not consider instructions in isolation (People v. Holt (1997) 15 Cal.4th 619, 677), but determine the correctness and sufficiency of the jury instructions by assessing the entirety of the charge (People v. Musselwhite (1998) 17 Cal.4th 1216, 1248). Even if CALCRIM No. 3475 implied that appellant was a trespasser, CALCRIM No. 505 protected his due process rights by fully and fairly setting forth the concepts of lawful self-defense and defense of another. Reversible error did not occur.

3. Evidence of Trespass as Misleading in Nature

17

Appellant contends criminal trespass, as defined by Penal Code section 602 and following sections, does not apply to the common areas of an apartment complex. He further contends a standard definition of trespass, such as that set forth in CALCRIM No. 2932 [trespass: entry into dwelling (Pen.Code, § 602.5(a) & (b))], would have informed the jury of the technical requirements for trespass and would have allowed the jury to "properly determine[ ] that appellant was not a trespasser."

In our view, appellant overemphasizes the brief reference to "trespasser" in CALCRIM No. 3475 to the exclusion of other, properly given instructions. When reviewing purportedly ambiguous jury instructions, we ask whether there is a reasonable likelihood jurors applied the challenged instructions in a way that violated the Constitution. (Estelle v. McGuire (1991) 502 U.S. 62, 72; People v. Welch (1999) 20 Cal.4th 701, 766.)  In making this determination, we must keep in mind that instructions are not considered in isolation. Instead, whether instructions are correct and adequate is determined by consideration of the entire charge to the jury rather than by reference to parts of an instruction or from a particular instruction. (People v. Holt, supra, 15 Cal.4th at p. 677; People v. Smithey, supra, 20 Cal.4th at pp. 963–964.)

CALCRIM No. 3475 and its predecessor instructions (CALJIC Nos. 5.40 and 5.42) do not include a technical definition of the term "trespasser." Appellant has not cited and we have been unable to find any specific case authority mandating such a definition as part of an instruction on the ejection of a trespasser in defense of property or characterizing the absence of such a definition as reversible error. Nor has appellant cited any authority permitting a defense of property instruction only when an individual on the premises has been adjudicated guilty of statutory trespass. Moreover, the court instructed the jury in CALCRIM No. 505 [justifiable homicide; self-defense or defense of another] and appellant expressly deems that instruction to be correct. CALCRIM No. 505 states in pertinent part: "When the original aggressor is not guilty of a deadly attack but of simple assault or trespass, the victim has no right to use deadly or other excessive force. If the victim uses such force, the aggressor's right of self-defense arises."(Italics added.)

Appellant fails to explain why or how the absence of a formal definition of "trespass" makes CALCRIM No. 3475 deficient while the absence of the same definition makes CALCRIM No. 505 correct. Appellant's claim that CALCRIM No. 3475 was misleading is not supported by the record or the law and must be rejected.

4. Alleged Prosecutorial Misconduct

In addition to claiming that CALCRIM No. 3475 was "fatally unclear on this record" due to the absence of a definition for "trespasser," appellant contends the prosecutor committed prejudicial misconduct by distorting CALCRIM No. 3475 in his closing argument. He argues on appeal:

> "[I]n the present case, the prosecutor built on a jury instruction which might be proper in some circumstances, but which was misconstrued here. According to the prosecutor, once appellant appeared at Garcia's door to settle the dispute over the abuse of Olivia and Raquel, Pete Garcia had a right to pull out his handgun. Normally, this would trigger the defendant's right to self defense—'The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury.' But according to the prosecutor, that right to self-defense disappeared due to the defendant's asserted trespasser status."

Appellant challenges the following portion of the prosecutor's argument at trial:

> "Now, Timothy Carrillo and Pete Garcia were not similarly situated. One's the homeowner, one's the intruder. If you follow the scenario. For example, if Pete ... brandished first, showed Timothy that he was armed and Timothy then had his gun at the ready, Pete Garcia would be entitled to fire first. Why do I say that? Because he's in

18

his home, he's being threatened, he has the right at that point of self-defense. He has a right of self-defense because he knows that if he doesn't fire first, he'll be shot. That's a scenario where he can fire first, he can be justified in firing first, and there's no right of self-defense in that situation.

"Remember he's inviting him [to] take out that gun and to show it and whatever. That's why he's taunting him the whole time. Are you packing Pete? Are you packing? Well, are you packing? I'm ready for you if you are is the implication, and, of course, he was packing and he was ready for him.

"And I think it's misplaced the entire inquiry [sic ] if, and it's still not certain, that Pete did fire first, but under the circumstances, as the person who has the right to defend himself and this person is there to provoke a fight or quarrel, the jury instruction Mr. Spokes touched on: 'The person does not have the right to self-defense if he provokes the fight or quarrel with the intent to create an excuse to use force.'[¶] It's precisely what he did in this case. This instruction, albeit real short, can't be any clearer.

"As I said, this fight didn't occur out in public or some parking lot or something like that. It occurred at the man's home with Olivia there, Cary Thompson there at 4:00 o'clock in the morning with him goading him and continuing to goad Pete. Yes, if things could have worked out differently, wouldn't it be wonderful. Two people wouldn't be dead. Wouldn't it ha[ve] been wonderful if someone had suddenly slammed the door and bolted it. Who knows what may have happened but it didn't happen that way. It didn't happen that day. The responsibility for those deaths lies with Mr. Carrillo."

"To constitute a violation of the federal Constitution, prosecutorial misconduct must '"so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process."' [Citations.]  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" (People v. Benavides (2005) 35 Cal.4th 69, 108.)  Appellant failed to object to the comments at the time of trial, an omission that ordinarily bars consideration of the claim on appeal.  (People v. Medina (1995) 11 Cal.4th 694, 756; People v. Benson (1990) 52 Cal.3d 754, 794.)  Appellant has not supplied any plausible basis for his contention that an objection and admonition could not have cured any harm that assertedly flowed from the prosecutor's remarks, despite his broad claims that "[t]he fundamental error was in the jury instruction" and counsel's "argument built directly on the misleading nature of CALCRIM 3475."

Appellant's claim of prosecutorial misconduct at argument must be rejected.

F. Conclusion

In evaluating the respective arguments of the parties, we are reminded that a single jury instruction regarding the right of a residential occupant to eject a trespasser is but an aspect of a greater issue in this case—the question of justifiable homicide and the role self-defense as between the deceased victim, Pete Garcia, and the surviving combatant, the appellant himself. Clearly, the court briefly instructed the jury in the right of an occupant to eject a trespasser from residential real property (CALCRIM No. 3475).  However, appellant's challenge to this instruction overlooks other pertinent instructions given in this case.

For example, the court expressly instructed the jury: "Evidence of the defendant's character as a protector of female family members can by itself create a reasonable doubt." (CALCRIM No. 350). The court also instructed: "Where the original aggressor i[s] not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. If the victim uses such force, the aggressor's right of self-defense arises...." (CALCRIM No. 505). The court further instructed on excusable homicide: accident (CALCRIM No. 510);

provocation: effect of degree of murder (CALCRIM No. 522); voluntary manslaughter: heat of passion—lesser included offense (CALCRIM No. 570); and voluntary manslaughter: imperfect self-defense (CALCRIM No. 571).

Moreover, the court expressly considered giving CALCRIM No. 3471 [right to self-defense: mutual combat or initial aggressor], which would have supplied appellant with another solid basis for self-defense. However, appellant's trial counsel objected to the instruction as inconsistent with the defense theory of the case and the evidence in the case.

Taking the instructions as a whole, and considering the arguments of the parties, we see no reasonable likelihood that the jurors interpreted CALCRIM No. 3475 to apply in a way that violated appellant's rights or his ability to present a defense. (See Estelle v. McGuire, supra, 502 U.S. at p. 72 [applying "'reasonable likelihood'" test to review of ambiguous instructions]; People v. Clair (1992) 2 Cal.4th 629, 663 [same].)

(Doc. 12, Ex. A, pp. 11-20).

### 2. Federal Standard.

The issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief. Estelle, 502 U.S. at 68. ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). Indeed, federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989). In addition, "the availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution." Sawyer v. Smith, 497 U.S. 227, 239 (1990), *quoting,* Dugger v. Adams, 489 U.S. 401, 409 (1989).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See Estelle, 502 U.S. at 72 & n. 4; Boyde v. California, 494 U.S. 370, 380 (1990).  However, a determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. See Calderon v. Coleman, 525 U.S. 141, 146 (1998). If an error is found, the court also must determine the error had a substantial and injurious effect or influence in determining the jury's verdict before granting habeas

relief. See id. at 146–47 (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

    In determining whether instructional error warrants habeas relief, a habeas court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)); California v. Roy, 519 U.S. 2, 5 (1996) (challenge in habeas to the trial court's jury instructions is reviewed under the standard in Brecht, 507 U.S. at 637--whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

    In a criminal case, an evidentiary device must not undermine the fact-finder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. County Court of Ulster County, N. Y. v. Allen, 442 U.S. 140, 156 (1979); In re Winship, 397 U.S. 358, 364 (1970). A permissive inference is one of the most common evidentiary devices, which allows, but does not require, the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. Ulster, 442 U.S. at 157, 99 S.Ct. at 2224. "Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." Id., 442 U.S. at 157, 99 S.Ct. at 2225; U.S. v. Warren, 25 F.3d 890, 897 (9th Cir. 1994); Sterling v. Roe, 2002 WL 826807 (N.D. Cal. 2002). "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." Francis v. Franklin, 471 U.S. 307, 314-315 (1985).

    The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. at 364. The Supreme Court held: "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of

proof.  Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt

to the jury."  <u>Victor v. Nebraska</u>, 511 U.S. 1, 5, 114 S.Ct. 1239 (1994).  This standard reduces the

chance that an innocent person will be conviction.  <u>Winship</u>, at 362.  <u>Winship</u> does not require every

fact upon which the jury relies be proven to a reasonable doubt.  Many facts not proven to that standard

may, collectively, allow the jury to infer an element of the crime is proven beyond a reasonable doubt.

To enforce <u>Winship</u>'s rule, judges must instruct juries that they cannot return a guilty verdict unless the

government has met this burden.  <u>Cool v. United States</u>, 409 U.S. 275, 278 (1972).  A jury conviction

based upon an impermissibly low quantum of proof violates the jury trial guarantee of the Sixth

Amendment.  <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 278 (1993).  A judge can violate a defendant's rights

by giving an instruction that undercuts the force of an otherwise proper beyond-a-reasonable-doubt

instruction.  <u>See, e.g., Cool</u>, 409 U.S. at 102-103; <u>Sandstrom v. Montana</u>, 442 U.S. 510, 521 (1979).

When a jury instruction is susceptible to a reading that would render the verdict unconstitutional

and another that would generate a proper verdict, the reviewing court considers the challenged

instruction in light of the full jury charge and in the context of the entire trial.  <u>See Naughten</u>, 414 U.S.

at 145-147(consider charge as whole); <u>United States v. Park</u>, 421 U.S. 658, 675 (1975)(consider context

of whole trial).  The court must then decide whether there is a reasonable likelihood that the jury

applied the challenged instruction in an unconstitutional manner.  <u>Estelle</u>, 502 U.S. at 72.  A verdict

remains valid if a jury instruction only tangentially undercut a proper beyond-a-reasonable-doubt

instruction.  <u>Naughten</u>, 414 U.S. at 149-150.

3.  <u>Analysis</u>.

Petitioner raises the same state-law arguments here that were rejected by the Court of Appeal.

He contends that instructing the jury with CALCRIM No. 3475 was erroneous because: (1) it shifted

the burden of proof in violation of federal due process; (2) the inference that Petitioner was a trespasser

was unfounded; (3) the evidence was "legally insufficient to establish that Petitioner was a trespasser,

although it was enough to mislead the jury; (4) the prosecution's argument distorted the instruction,

resulting in a denial of due process; and (5) the instruction misled the jury on the principles of self-

defense in violation of Petitioner's due process rights.

While it is clearly-established federal law that "[t]he government must prove beyond a

1    reasonable doubt every element of a charged offense," <u>Victor</u>, 511 U.S. at 5, the Court is unconvinced

2    the alleged errors complained of by Petitioner lightened the prosecutor's burden in this case or

3    improperly shifted a burden of proof to petitioner. In any criminal case, the prosecutor presents

4    evidence to establish that the offense has been committed, and the defendant has the option to rebut that

5    evidence to demonstrate that the evidence fails to establish the elements of the offense beyond a

6    reasonable doubt. Here, the prosecutor presented evidence that Petitioner was trespassing and therefore

7    his legal right to use force against the victim was limited, and the jury was instructed as to how to

8    address that evidence under California law. Specifically, the testimony of Raquel Baca, Garcia's

9    girlfriend, established that she had not invited Petitioner and his friends over to start a fight with Baca,

10   to defend her, or for any other such purpose.  Since it is clear Garcia did not invite Petitioner, a juror

11   could reasonably assume that Petitioner was a trespasser.  Of course, the jurors could have rejected that

12   testimony and concluded as well that Petitioner had been implicitly invited to Baca's residence to

13   protect her against Garcia.  However, those factual issues were squarely within the province of the jury

14   and CALCRIM 3475 did not, in any way, shift the burden of proof to Petitioner from the prosecution.

15          An instruction that, as here, creates a permissive inference does not, *ipso facto*, shift the burden

16   of proof, and will not violate due process unless it cannot be said "'with substantial assurance'" that the

17   inferred fact is "'more likely than not to flow from the proved fact on which it is made to depend.'"

18   <u>County Court of Ulster County v. Allen</u>, 442 U.S. 140, 167 & n. 28 (1979)(quoting <u>Leary v. United</u>

19   <u>States</u>, 395 U.S. 6, 36 (1969)). Courts "determine the constitutionality of a permissive inference

20   instruction on a case-by-case basis" by reviewing the record evidence to see if the court can say with

21   substantial assurance that the inferred fact flows more probably than not from the facts proven in the

22   particular case. <u>See, e.g., Ulster County</u>, 442 U.S. at 162-167 (finding instruction constitutional only

23   after concluding that inference more probably than not flowed from specific facts proven to jury at

24   trial).

25          In the Court's view, the 5th DCA focused on the fundamental issue when it described the central

26   question as "the question of justifiable homicide and the role of self-defense as between the deceased

27   victim, Pete Garcia, and the surviving combatant, [Petitioner] himself."  The gravamen of Petitioner's

28   argument is that the challenged instruction diminished the viability of his claim of self-defense.

23

However, as the 5th DCA noted, the challenged instruction is not viewed in isolation, but rather as part of the overall jury charge.  The state court noted the jury was specifically instructed that "Evidence of the [Petitioner's] character as a protector of female family members can by itself create a reasonable doubt."  Also, the court instructed the jury that "Where the original aggressor i[s] not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force.  If the victim uses such force, the aggressor's right of self-defense arises…."  Additional, the jury was instructed on excusable homicide through accident, provocation, the effect of degree of murder, voluntary manslaughter, heat of passion as a lesser included offense, and voluntary manslaughter (imperfect self-defense).  Of course, the jury was given the normal instructions on burden of proof as well.

Respondent notes that the jury was instructed that "[s]ome of these instructions may not apply depending on the finding about the facts in the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you decided what the facts are, follow the instructions that you apply to the facts as you find them."  (Doc. 12, p. 36).   This is entirely consistent with federal habeas law regarding jury instructions. See, e.g., Ulster, 442 U.S. at 157 ("Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." ); Francis v. Franklin, 471 U.S. at 314-315 ("A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.").

Here, as a whole, the instructions adequately instructed the jury regarding the burden of proof, the defense of self-defense, and the relation of that defense to the reasonable doubt instruction. It is specious to assert otherwise.  The jury is presumed to have followed those instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Moreover, the jury was free to accept or reject the permissive inferences referenced above based upon its collective view of the evidence.  That it reached a conclusion with which Petitioner disagrees is not, by itself, a basis for habeas relief.  Accordingly, the state court decision is not contrary to nor an unreasonable application of clearly established federal law.

24

28 U.S.C. § 2254(d).  Hence, the claim will be denied.[2]

   B.  Use Of Instruction On Provocation

   Petitioner next contends that the trial court erred in instructing the jury regarding provocation of a fist fight.  This contention is also without merit.

      1.  The 5th DCA's Opinion.

   The 5th DCA rejected Petitioner's claim as follows:

   Appellant contends the trial court committed reversible error by giving CALCRIM No. 3472 [right to self-defense; may not be contrived] under the circumstances of this case.

   A. Background

   At the September 15, 2009, jury instruction conference, the trial court mentioned CALCRIM No. 3472.  Defense counsel opposed giving the instruction because he did not believe it fit the facts of appellant's case.  Defense counsel acknowledged that, according to Valdovinos, appellant called Garcia to come outside of the apartment.  However, counsel maintained there was no mutual combat and his client "certainly was not provoking a deadly fight."  The prosecutor argued appellant and his three companions went to Garcia's apartment "with the express purpose to fight him."   The prosecutor also noted that appellant knew that Garcia was "apt to resort to firearms" and appellant was "prepared and ready to meet that exigency."  In reply, defense counsel contended the intent to go to the apartment and engage in fisticuffs "is provoking a fight or a quarrel, but that's not inviting somebody to shoot you."  The court noted it was ultimately the People's burden to prove the killing was not in self-defense. While defense counsel agreed with that point, he asserted "if it's mutual combat, there's no self-defense involved.  The way the instruction currently reads, it doesn't draw the line between fisticuffs and the use of deadly force. If you insert the word 'deadly' in front of the word 'force,' I would have no objection to the instruction."  Defense counsel further argued:  "The issue is you can't go over and instigate a fight or a quarrel with the intent to use deadly force, claim self-defense and use deadly force."  After some additional argument, the court said it would give the instruction over defense objection and reminded the parties that it was "the People's burden of proof to prove that Mr. Carrillo had the intent to create an excuse to use force."  The court expressly permitted defense counsel to argue deadly force.

   The court subsequently instructed the jury in CALCRIM No. 3472 as follows:

      "The person does not have the right to use self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

---

[2] Petitioner also contends that the prosecution engaged in misconduct by referencing the challenged instruction and thereby misled the jury.  Respondent's rejoinder is that the claim is procedurally barred because no contemporaneous objection was made by the defense.  Here, given the Court's conclusion that the instruction, when considered within the overall general charge to the jury, was justified, it is difficult to see how comments by the prosecution in closing argument about a justified instruction could possibly constitute misconduct.  Nor, given the foregoing discussion, does the Court see how such comments could have so confounded the jury that it would rise to the level of a federal due process violation. The general jury charge provided a wide array of options other than the verdict that it ultimately reached.  Many of those options would have resulted in a shorter sentence than Petitioner received.  The heart of Petitioner's argument seems to be not that the trial court erred in giving the jury these various options, but rather that the jurors eventually chose an option that carried the heaviest penal sanctions.  However, if the jury was, as here, properly instructed, it is not the function of a federal habeas court to insert its own judgment for that of the jurors who heard the case.  Accordingly, the Court rejects any contention by Petitioner that the prosecution engaged in misconduct during closing argument.

## B. Closing Arguments

At closing argument, defense counsel characterized CALCRIM No. 3472 as "a little bit misleading."   Counsel conceded the appellant went to the apartment and challenged Pete Garcia to a fist fight and not a gun fight.  Counsel advised the jurors:  "[R]eading that instruction you probably should consider the question about whether or not he's going to use deadly force." During his closing argument, the prosecutor characterized Garcia as a homeowner and appellant as an intruder.  He maintained even if Garcia brandished a weapon first and appellant "had his gun at the ready,"  Garcia was entitled to fire first because he was being threatened in his home and had a right of self-defense.  The prosecutor reminded the jury that appellant taunted Garcia by saying, "Are you packing Pete?  Are you packing?  Well are you packing?  I'm ready for you if you are is the implication, and, of course, he was packing and he was ready for him."  The prosecutor read the "provokes the fight or quarrel" language of CALCRIM No. 3472 and added, "It's precisely what he [appellant] did in this case."

## C. Analysis

Appellant offers a meandering, multifaceted attack on CALCRIM No. 3472. He first implies that CALCRIM No. 3472 is erroneous on its face. As we observed with respect to CALCRIM No. 3475 above, the parties have not cited and we have been unable to find any case authority invalidating or questioning the accuracy of expression of CALCRIM No. 3472. Absent such authority, we conclude CALCRIM No. 3472 accurately stated the existing law and the trial court properly gave the instruction pursuant to California Rules of Court, rule 2.1050(e).

Appellant next contends that CALCRIM No. 3472 is defective because it does not set forth the principles embodied in former CALJIC No. 5.32, regarding the use of a deadly weapon in response to an assault with fists. He also contends CALCRIM No. 3472 shifted the burden of proof from the prosecution to the defense. We initially note that appellant cites to the wrong CALJIC instruction. Former CALJIC No. 5.31, not 5.32, stated:

> "An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believes and a reasonable person in that same or similar circumstances would believe that the assault is likely to inflict great bodily injury upon [him][her]."

Appellant points out that Penal Code section 197, subdivision (e) is the source for the underlying principle of CALJIC No. 5.31—that an assault with less than deadly force does not allow a response with deadly force. He argues:

> "By the terms of that statute, a person claiming self-defense must have a 'reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished.' The statute does not justify the use of deadly force in response to an assault with fists. In order to justify Pete Garcia's action in drawing his gun, the prosecution had to demonstrate that the defendant's actions amounted to the imminent commission of a felony or an attack to inflict great bodily injury—but not the initiation of a mere fist fight. [¶] ... [¶]

> "Since no criminal defendant could properly claim self-defense in Garcia's position, the prosecution could not claim self-defense in his behalf. Therefore, to the extent the People's case relied on a claim of self-defense attributable to Pete Garcia, Garcia's use of deadly force could not be justified by a threat of non-deadly force by the defendant. CALCRIM [No.] 3472 should not have been applied to this record." (Fn.omitted.)

As we previously observed, "a single instruction is not to be viewed in 'artificial isolation'; instead, it must be evaluated 'in the context of the overall charge.' [Citations.]" (People v. Espinoza (1992) 3 Cal.4th 806, 823–824.)  "What is crucial for present purposes is the meaning

26

that the instructions communicated to the jury.  If that meaning was not objectionable, the instructions cannot be deemed erroneous. [Citation.]"  (People v. Benson, supra, 52 Cal.3d at p. 801, italics omitted.)

Here, the court also instructed the jury in CALCRIM No. 505 [justifiable homicide: self-defense or defense of another], which stated in pertinent part:

> "A defendant is not required to retreat. [H]e or she is entitled to stand his or her ground and defend himself or herself and if reasonably necessary pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating. Great bodily injury and significant or substantial injury, it is injury that is great than minor or moderate harm.

> "The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If they have not met this burden, you must find the defendant not guilty of murder or manslaughter.

> "When the original aggressor is not guilty of a deadly attack but of simple assault or trespass, the victim has no right to use deadly or other excessive force. If the victim uses such force, the aggressor's right of self-defense arises.

> "If, however, the counterassault be so sudden and perilous that no opportunities be given to decline or make known to his adversary of his willingness to decline or make known to the adversary of his willingness to decline to strike if he cannot retreat with safety, then the greater wrong of the deadly assault is upon the opponent, he would be justified in ... slaying forthwith in self-defense."

In view of the foregoing portions of CALCRIM No. 505, there was no reasonable likelihood the jury was misled as to the law of self-defense and justifiable homicide. The charge to the jury correctly stated the applicable law and there was no error.

(Doc. 12, Ex. A, pp. 20-22).

   2. Federal Standard.

The same federal standard applies as in the first claim for relief.

   3. Analysis.

   To the extent that Petitioner is contending that CALCRIM No. 3472 was erroneous and did not correctly state California law, such claims are, as mentioned previously, outside the scope of federal habeas courts since they are exclusively questions of state law and the state court's determination that the instruction properly stated California law is binding on this court.  Estelle, 502 U.S. at 67 ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-349 (1993) (O'Connor, J., concurring)("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").

   To the extent that Petitioner maintains that the instruction wrongfully shifted the burden from

the prosecution to the defense, Petitioner is once again mistaken.  Nothing in the instruction specifically

refers to the burden of proof and, as was the case with CALCRIM No. 3475, the entire jury charge,

taken as a whole, clearly and unequivocally instructed the jury regarding the prosecution's burden of

proof beyond a reasonable doubt as well as its burden to disprove self-defense.  Also, as discussed

above, the jurors were presented with a variety of options regarding the degree of criminal culpability

Petitioner should bear for his conduct.  The fact that the jurors ultimately chose the more severe degree

of criminal culpability was the result of the jury's deliberative choices among conflicting evidence, and

not the result of a defective jury charge that confused or misled jurors in their deliberations.  Under

such circumstances, the state court's adjudication that the instruction did not violate Petitioner's due

process rights was not objectively unreasonable.

C.  Instruction On Consciousness Of Guilt Resulting From Flight

Petitioner next argues that the trial court erred in instructing the jury regarding consciousness of

guilt resulting from flight.  This contention too is without merit.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Appellant contends an instruction on consciousness of guilt from flight was unsupported by the
evidence because appellant "left the scene in a hail of bullets, seriously wounded [and][h]e
immediately sought assistance at a nearby fire station, which was next to the police
department."

A. Instructional Conference

At the reported jury instruction conference, the court raised CALRIM No. 372 and defense
counsel asserted, "There was no flight."  Counsel maintained appellant left the scene because he
was dying. The prosecutor acknowledged that appellant departed for a dual purpose but
suggested it was a question for the jury.  The court noted the objection of the defense but
concluded it was appropriate to give the instruction.  The court advised both counsel,  "That's
obviously something you can argue both of you in terms of whether Mr. Carrillo fled or not or
was merely attempting to obtain or receive medical treatment...."

B. The Instruction Given to the Jury

The court instructed the jury in CALCRIM No. 372 [defendant's flight] as follows:
    "If the defendant fled immediately after the crime was committed, that conduct may
    show that he was aware of his guilt. If you conclude the defendant fled, it is up to you to
    decide the meaning and importance of that conduct."

C. Governing Law

Penal Code section 1127c provides:

28

"In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.

"No further instruction on the subject of flight need be given."

"This statute was enacted to abolish the common law rule that the jury could not be instructed on flight unless there was evidence defendant knew he had been accused."  (People v. Pensinger (1991) 52 Cal.3d 1210, 1243.)  "A flight instruction is proper whenever evidence of the circumstances of defendant's departure from the crime scene or his usual environs, or of his escape from custody after arrest, logically permits an inference that his movement was motivated by guilty knowledge."  (People v. Turner (1990) 50 Cal .3d 668, 694.)

D. Defense Counsel's Closing Argument

During argument, defense counsel cited to the instruction, pointed out it was up to the jury to decide the meaning and importance of appellant's conduct at the scene, and reminded the jurors that evidence of flight by itself could not prove guilt.  Counsel specifically argued to the jury: "Well folks, when you've been shot three times.... And they took him [appellant] to the fire station. Where's the fire station?  It's in the same building with the police department.  If your flight is a sign of consciousness of guilt, what are you doing running to the police department?"

E. Analysis

Section 1127c requires that whenever evidence of flight is relied on to show guilt, the court must instruct that while flight is not sufficient to establish guilt, it is a fact which, if proved, the jury may consider. (People v. Williams (1997) 55 Cal.App.4th 648, 651.)  A flight instruction is proper where the evidence shows the defendant departed the scene under circumstances suggesting his movement was motivated by a consciousness of guilt.  Flight requires neither the physical act of running nor the reaching of a far-away haven.  Yet, flight manifestly does require a purpose to avoid being observed or arrested.  Mere return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt.  However, the circumstances of departure from the crime scene may sometimes do so.  (People v. Bradford (1997) 14 Cal.4th 1005, 1055; People v. Carter (2005) 36 Cal.4th 1114, 1182.)

To warrant the giving of CALCRIM No. 372, the prosecution need not provide that the defendant in fact fled, i.e., departed the scene to avoid arrest.  Rather, the prosecution need only prove that a jury could find that defendant fled and permissibly infer a consciousness of guilt from the evidence. (People v. Bonilla (2007) 41 Cal.4th 313, 328 [construing CALJIC No. 2.52, predecessor instruction to CALCRIM No. 372].)  Alternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury, and not the court, to decide. (People v. Rhodes (1989) 209 Cal.App.3d 1471, 1477.)  CALCRIM No. 372 assumes neither the guilt of the defendant nor that flight occurred. (People v. Campos (1982) 131 Cal.App.3d 894, 900.)  The Third District Court of Appeal recently upheld the constitutionality of CALCRIM No. 372. (People v. Paysinger (2009) 174 Cal.App.4th 26, 30–31.)  This court has held that CALCRIM No. 372 does not impermissibly presume the existence of a defendant's guilt or lower the prosecution's burden of proof.  (People v. Hernandez Rios (2007) 151 Cal.App.4th 1154, 1159.)

In this case, appellant left the Almond Terrace Apartments with his three friends immediately after the shooting occurred.  The evidence did show that appellant sought medical attention after

29

the shooting and defense counsel pointed out that fact during argument. Even if we were to conclude the instruction should not have been given, any error would have been harmless. The instruction did not assume that flight was established. Rather, the instruction permitted the jury to make that factual determination and to decide what weight to accord it. (People v. Carter (2005) 36 Cal.4th 1141182–1183.) Upon review, we must presume the jury followed the law as presented, and, if flight was not proven, that it was not considered in reaching a verdict. (People v. Sing Chan (1944) 64 Cal.App.2d 167, 173, disapproved on another ground in People v. Mathis (1965) 63 Cal.2d 416, 430.)

The giving of CALCRIM No. 372 did not amount to a miscarriage of justice under the facts and circumstances of this case.

(Doc. 12, Ex. A, pp. 22-24).

> 2. Federal Standard.

The same federal standard applies as with the previous two claims for relief.

> 3. Analysis.

Petitioner contends, in essence, that the jury instruction on consciousness of guilt from flight was not supported by evidence at trial because the evidence showed that Petitioner was not attempting flight but rather to seek medical attention for his wounds. However, as the 5th DCA noted, the issue is not whether the instruction was supported by sufficient evidence because the instruction assumed a hypothetical, as it were, which the jury was expressly instructed that it could find true or not, depending upon how the jury weighed the evidence. If the jurors found that Petitioner indeed had sought medical attention and was not attempting to flee, then they were instructed not to consider consciousness of guilt. On the other hand, if the jurors believed that Petitioner and his cohorts had fled the scene of the shooting and then later sought medical attention for Petitioner's wounds, then could decide the "meaning and importance of that conduct" and, in doing so, they could consider consciousness of guilt.

Petitioner argues, unpersuasively, that the instruction shifted the burden to Petitioner. However, nothing in the instruction expressly shifted the burden of proof, nor, indeed, required that the jurors even find that Petitioner fled the scene. On what Petitioner calls the question at the "heart of the case," i.e., "whether the fatal confrontation was provoked by the [Petitioner] or by Pete Garcia," the challenged instruction takes no position. It merely instructs the jurors that, *should they find* that Petitioner fled the scene, they *may also* infer consciousness of guilt. The state court reasonably found that, if error, the instruction was harmless. Similarly, this Court concludes that giving jurors the

option of finding that Petitioner fled or sought medical treatment was not prejudicial.  Accordingly, any error was harmless.  Brecht, 507 U.S. at 623.

    D.  Reversible Evidentiary Error

    Petitioner contends that the trial court committed reversible evidentiary error when it permitted the introduction of evidence of a handgun found at Petitioner's house that was not the murder weapon. This contention is likewise without merit.

    1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

A. Background

On September 2, 2009, the court and counsel met outside the presence of the jury. The prosecutor mentioned that the Ceres Police Department had recovered a gun from appellant's home, and that a cartridge referred to by criminalist Lawson "could have come from that gun, but that it would be a stretch, but it's possible."  The prosecutor referenced a comparison of test-fired bullets with bullets removed from the scene and from body of victim Thompson. The prosecutor specifically acknowledged:  "Based on the agreement of general rifling characteristics combined with the absence of correspondence in microscopic detail, these bullets cannot be identified or eliminated as being fired in the Smith & Wesson revolver.  However, based on differences in microscopic detail, they were most likely not fired from the Smith & Wesson revolver."  Defense counsel maintained the bullets at the scene "most likely [weren't] fired from that gun, so I think under [Evidence Code section 352,] prejudicial effect outweighed by zero evidence or zero relevance, since he eliminated it as being the firearm."  The court allowed the prosecutor to present evidence of the weapon and reminded defense counsel that he could interpose an objection at the time the prosecutor moved to admit the weapon into evidence. The court explained:  "[T]here is some, although I grant a not real large possibility, but there is some probative evidence that this firearm could have been the same one, but then that still comes up with the problem as to how it ended up there [in appellant's residence]."

Criminalist Scott Bauer testified the bullets recovered from the scene and from Thompson's body were most likely not fired from the Smith & Wesson. He testified on direct examination: "From my examination of my test fire from the Smith & Wesson revolver, I saw no microscopic marks that looked similar to those bullets at all, and I would expect if it was fired from the same firearm, I would see at least some correspondence in those markings, but I didn't see any. But, again, I couldn't eliminate it or identify it but in my opinion most likely not."  On cross-examination, Bauer confirmed that in his opinion the test bullets were most likely not fired by the Smith & Wesson.

B. Governing Law

Evidence Code section 353 states:

    "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:

    "(a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and

"(b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in defendant's possession. That is because such evidence tends to show not that defendant committed the crime, but only that he or she is the sort of person who carries deadly weapons. (People v. Barnwell (2007) 41 Cal.4th 1038, 1056.) In the instant case, law enforcement officers found a .38–caliber Smith & Wesson six-shot revolver inside a bag in appellant's closet sometime after the April 15, 2007, shooting. In the opinion of criminalist Scott Bauer, the bullets recovered from the bodies of Pete Garcia and Cary Thompson were most likely not fired from the gun recovered from appellant's closet. However, Bauer was unable to conclusively say that the Smith & Wesson did not fire the bullets that struck Garcia and Thompson. The prosecutor frankly acknowledged these facts but nevertheless sought admission of the weapon because a cartridge referenced by criminalist Lawson "could have come from that gun, but that it would be a stretch, but it's possible."

The jury was well aware that appellant discharged a firearm at Pete Garcia in the Almond Terrace Apartments during the early morning hours of April 15, 2007. However, evidence that the bullets came from the Smith & Wesson revolver found at appellant's home was minimal. Criminalist Scott Bauer testified that criminal Lawson recovered four discharged bullets at the scene. One of the four bullets was recovered from Garcia's body and two of the four were recovered from Thompson's body. Bauer determined the four bullets were not fired from the Rossi revolver recovered from the entry of the Valdovinos/Garcia apartment. As to the Smith & Wesson revolver, Bauer testified he "could not eliminate or identify the bullets as being fired from the revolver." Bauer explained: "It's a fine line. The ... bullets that were recovered, they had some very good markings on them. From my examination of my test fire from the Smith & Wesson revolver, I saw no microscopic marks that looked similar to those bullets at all, and I would expect if it was fired from the same firearm, I would see at least some correspondence in those markings, but I didn't see any. But, again, I couldn't eliminate it or identify it but in my opinion most likely not."

Bauer's testimony was tentative at best and the trial court conceded there was "a not real large possibility" that the Smith & Wesson revolver was the weapon that fired the bullets that killed Garcia and Thompson. Even if we assume the evidence should have been excluded on the ground stated (Evid.Code, § 353, subd. (b)), that assumption does not end our inquiry. Reversal is required only when the errors complained of resulted in a miscarriage of justice. (Evid.Code, § 353, subd. (b).) "[A] miscarriage of justice should be declared only when the court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (People v. Rains (1999) 75 Cal.App.4th 1165, 1170.) Prejudice is never presumed; it must be affirmatively demonstrated. (People v. Zunis (2005) 134 Cal.App.4th Supp 1, 4.)

Appellant claims he was prejudiced because admission of the Smith & Wesson into evidence served only to demonstrate that he is the sort of person who hoards deadly weapons and has a propensity for violence. From the entirety of the evidence, the jury was well aware that (1) appellant engaged in an exchange of gunfire with Pete Garcia at the Almond Terrace Apartments; (2) Garcia and Thompson died from wounds sustained during that exchange; and (3) bullets removed from the bodies of Garcia and Thompson did not match the Rossi revolver which Garcia used at the scene. Appellant's presence and active participation in the gunfight were well-established by various witnesses. Given these facts and circumstances, we cannot say a miscarriage of justice occurred because appellant has failed to demonstrate a reasonable probability that a result more favorable to him would have occurred had evidence of the Smith & Wesson revolver been excluded.

32

(Doc. 12, Ex. A, pp. 24-25).

           2.  Federal Standard.

      Initially, the Court notes that the Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process.  See  Estelle, 502 U.S. at 75, n. 5; see Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir.2002) (habeas relief not warranted unless due process violation clearly established by the Supreme Court); Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), *reversed on other grounds*, Woodford v. Garceau, 538 U.S. 202 (2003)(the Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith....").  In this regard, in Holley v. Yarborough, 568 F.3d 1091 (9th Cir. 2009), the Ninth Circuit explained as follows:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ [of habeas corpus] should be issued when constitutional errors have rendered the trial fundamentally unfair [Citations], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley, 568 F.3d at 1101.  Hence, the state courts' rejection of Petitioner's claim *could not* have been "contrary to, or an unreasonable application of, clearly established" United States Supreme Court authority, since no such "clearly established" Supreme Court authority exists.  28 U.S.C. § 2254(d)(1).

      Second, Petitioner's claim would normally sound only in state law and, therefore, would not be cognizable in federal habeas proceedings. A federal habeas corpus court has no authority to review a state's application of its own laws, but rather must determine whether a prisoner's constitutional or other federal rights have been violated.  Estelle, 502 U.S. at 67-68; Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990).  Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding.  Estelle, 502 U.S. at 67; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).

      Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process.  Estelle, 502 U.S. at 72; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence

33

alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at 920.

           3.  Analysis.

First, Respondent correctly points out that no clearly established federal law exists regarding the admission of prejudicial evidence and, alternatively, that the admission of evidence is strictly an issue of state law.  The Court agrees with both arguments.

However, Petitioner also loses on the merits.  Here, the state court concluded that, because the experts could not expressly rule out the weapon found at Petitioner's residence as the murder weapon, it had some slight probative value.  Petitioner has argued the probative value is so miniscule that it would necessarily be outweighed by its prejudicial effect.  Respondent, in turn, argues the evidence was "irrelevant" because the prosecution never linked the weapon to the murders.  (Doc. 12, p. 47).

Obviously, the weighing process required under Penal Code § 452 can be a difficult one where the probative value of the disputed evidence is, as here, not substantial.  However, even assuming that the admission of the evidence was improper, it could not have amounted to a violation of Petitioner's due process rights, i.e., its admission was not "fundamentally unfair."  Estelle, 502 U.S. at 72.  This is so because, as the 5th DCA pointed out, the inference the defense contended could be prejudicially drawn from the admission of the weapon was that Petitioner was the type of person had kept in his possession a deadly weapon.  Yet the jury had been presented with virtually undisputed evidence that Petitioner went to the victims' residence and engaged in a shootout with one victim that resulted in the death of both victims.  The evidence was also undisputed that the bullets that killed the unarmed second victim were not from the first victim's gun.  Thus, the only reasonable inference was those bullets came from Petitioner's weapon.  Because the jury already had overwhelming evidence that Petitioner was the type of person who not only possessed a deadly weapon, but aggressively used it to kill other individuals, admission of another, unrelated weapon found at his residence—a weapon that had only the most tenuous connection to the crimes at issue--could not and did not impact the jury's verdict.  Accordingly, even if admission of the weapon was error, it was harmless.  Brecht, 507 U.S. at 623.  The

state court's rejection of this claim was not objectively unreasonable under these circumstances.

Accordingly, this claim is denied.

E. Exclusion Of Evidence

Petitioner further contends that the trial court committed reversible error when it erroneously excluded evidence of a prior conviction by Garcia. This contention lacks merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

A. Background

During trial, Carmen Gutierrez, Valdovinos's aunt, testified that her niece lied when she said she shot appellant. She said Valdovinos was trying to protect Pete Garcia "because he already had a case for shooting somebody else." On September 8, 2009, shortly after Gutierrez's testimony, the court and counsel met outside the presence of the jury to discuss the admissibility of the criminal conviction records of appellant and Garcia. At one point in the discussion, defense asserted: "... I believe under [Evidence Code section] 1103(a)(1), that I should be able to bring in instances of specific conduct by ... Mr. Garcia, that tends to show that he acted in conformity with that character of always carrying guns and ... exhibiting assaultive behavior." The prosecutor noted that several witnesses had already testified that Garcia had such a reputation "and suggested they were present in a room when he held a gun to Ms. Valdovinos' head and tried to push her out a window."

After some discussion, the court noted the door had been opened as to specific instances of Garcia's conduct but was reluctant because such conduct did not result in convictions. The court observed, "[W]e'll have to decide how much of that evidence comes in." Later in the discussion, the court suggested: "... I can take judicial notice of that conviction [of Garcia on June 26, 2003] ... and we can state that he was convicted of a [Penal Code section] 243(e)(1), battery on a cohabitor and leave it at that. I think that would be the cleanest way to do it." The prosecutor agreed with the court but defense counsel noted: "Although I intend to present some testimony concerning the facts and circumstances surrounding Mr. Garcia's felony conviction, I'll provide you with enough information for you to do a judicial notice of that conviction as well...." Defense counsel explained that he wanted to bring in an eyewitness to testify that Garcia shot someone in the back on an earlier occasion and that he reached a plea bargain in the earlier case. In response, the prosecutor argued such evidence was cumulative because the jury was aware from other evidence that Garcia had violent propensities and carried weapons. The prosecutor maintained: "... I don't think that under [Evidence Code section] 352 we should ... be in a position of trying Pete Garcia all over again for that crime."

After a recess, the court examined the file in the 2002 assault case against Pete Garcia. The court noted the original complaint charged attempted murder by Garcia. Defense counsel maintained he could introduce evidence underlying Garcia's conviction because the language of Evidence Code section 1103 stated the prior conviction could be proven by acts. The prosecutor agreed with this legal point but questioned whether testimony about the acts would be reliable or whether such evidence should be admitted under Evidence Code section 352. The prosecutor stated: "... I think it is prejudicial under 352 and could open up a whole range of other people coming in, and then we're going to do a trial of trying the case of whether he was guilty of attempted murder." At the conclusion of the proceedings on September 9, 2009, the court advised counsel he would read reports of the 2002 "event involving attempted murder charges which resulted in a [Penal Code section] 245 conviction against Mr. Garcia."

35

During a break in the proceedings of September 20, 2009, the court advised counsel he had reviewed police reports of Garcia's 2002 assault case.  Defense counsel noted that a firearm was involved in the assault case.  He suggested that one witness would testify that Garcia fired the weapon and another witness would testify that Garcia removed the firearm from his waistband and gave it to a third person to fire.  He also maintained he had a right to present such evidence "to support the testimony of the [trial] witnesses that [Garcia] had a reputation for carrying a firearm."

The court ultimately ruled:

"Under [Evidence Code section] 352 I'm not going to allow any testimony.  The simple fact we would have a trial within a trial concerning whether Mr. Garcia was the one that had the gun or not.  There's plenty of evidence of firearms, loaded firearms being around the house with Olivia, and obvious evidence that he did use the firearm in this particular case, so I don't think there's an issue about whether or not he would use a firearm because he obviously did in this case."

At the conclusion of the evidence, the court informed the jury: "That Pete Silverio Garcia was convicted of felony assault with force likely to produce great bodily injury on October 16th of 2002."

B. Governing Law

Evidence Code section 354 states:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that:

"(a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means;

"(b) The rulings of the court made compliance with subdivision (a) futile; or

"(c) The evidence was sought by questions asked during cross-examination or recross-examination."

The rule of Evidence Code section 354 is necessary because, among other things, the reviewing court must know the substance of the excluded evidence in order to assess prejudice.  (People v. Anderson (2001) 25 Cal.4th 543, 580.)  Under California law, it is the burden of the proponent of evidence to establish its relevance through an offer of proof or otherwise.  An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice.  To accomplish these purposes, an offer of proof must be specific and must set forth the actual evidence to be produced rather than merely the facts or issues to be addressed and argued.  (People v. Schmies (1996) 44 Cal.App.4th 38, 51, 53.)

Where discretionary power is vested in the trial court, the exercise of that discretion must not be disturbed on appeal except upon a showing that the court exercised its discretion in an arbitrary, capricious, or patently absurd manner resulting in a miscarriage of justice.  (People v. Rodrigues (1994) 8 Cal.4th 1060, 1124–1125.)  A miscarriage of justice should be declared only when the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error.  (In re Marriage of Smith (1978) 79 Cal.App.3d 725, 751.)  Expressed another way, where a trial court's ruling does not constitute a refusal to allow defendant to present a defense, but merely rejected certain evidence concerning the defense, the ruling does not

36

constitute a violation of due process.  In that situation, the appropriate standard of review is whether it is reasonably probable the admission of the evidence would have resulted in a verdict more favorable to defendant. (People v. Espinoza (2002) 95 Cal.App.4th 1287, 1317.)

C. Analysis

In the instant case, defense counsel introduced evidence to show that Pete Garcia had a reputation being a member of the Norteno criminal street gang and for carrying guns.  Counsel further introduced evidence that Garcia was twice arrested in possession of loaded firearms.  At the conclusion of the evidence, the court advised the jury that Garcia previously had been convicted of assault with force likely to produce great bodily injury.  The record clearly showed that Garcia fired a loaded gun at the Almond Terrace Apartments during the early morning hours of April 15, 2007.  A trial judge is not bound to allow cumulative testimony upon the same point. (Douillard v. Woodd (1942) 20 Cal.2d 665, 669.)  Had the court allowed the defense to show that Garcia previously shot another individual in the back, it is not reasonably probable that admission of such evidence would have resulted in a more favorable verdict.

The trial court did not abuse its discretion by excluding the proffered evidence.

(Doc. 12, Ex. A, pp. 26-29).

2. Federal Standard.

a. Confrontation Clause.

The right to confront witnesses, guaranteed by the Sixth and Fourteenth Amendments, includes the right to cross-examine adverse witnesses to attack their general credibility or show their possible bias or self-interest in testifying. Olden v. Kentucky, 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678-79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1973). A Confrontation Clause violation occurs where the defendant is prevented from investigating "a prototypical form of bias" if "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination"). Van Arsdall, 475 U.S. at 680. However, "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned" and may impose limitations on cross-examination that are "reasonable" and are not "arbitrary or disproportionate to the purposes they are designed to serve." Id. at 679; Michigan v. Lucas, 500 U.S. 145, 151, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991). "The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Van Arsdall, 475 U.S. at 679 (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). A

37

1  defendant does not have a right to present irrelevant evidence. Wood v. State of Alaska, 957 F.2d 1544,

2  1549 (9th Cir.1992). The determination of whether evidence is relevant rests in the discretion of the

3  trial court. Id.

4       A two-part inquiry is appropriately used to determine whether a criminal defendant's Sixth

5  Amendment rights were violated by the exclusion of evidence. Wood, at 1549-50. First, the court looks

6  at whether the evidence was relevant. Id. at 1550. If the evidence is relevant, the court looks at whether

7  "legitimate interests outweighed [the defendant's] interest in presenting the evidence." Id.  A Sixth

8  Amendment violation will only be found if the trial court abused its discretion in making its evidentiary

9  ruling. Id. A trial court does not abuse its discretion so long as the jury has "sufficient information"

10  upon which to assess the credibility of witnesses. Wood, 957 F.2d at 1550.

11       The improper denial of a defendant's opportunity to impeach a witness for bias is subject to a

12  harmless-error analysis. Van Arsdall, 475 U.S. at 684; Bockting v. Bayer, 399 F.3d 1010, 1020 (9th

13  Cir.2005) ("Confrontation Clause violations are subject to harmless error analysis and thus may be

14  excused depending on the state of the evidence at trial"). Thus, a petitioner is not entitled to relief

15  unless he can establish that the trial court's error "had substantial and injurious effect or influence in

16  determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). See also Forn v.

17  Hornung, 343 F.3d 990, 999 (9th Cir.2003) (finding that a Confrontation Clause error did not have a

18  "substantial and injurious" effect on the verdict and that the error was therefore harmless).

19                             b.  Due Process.

20       Petitioner argues the trial court's exclusion of defense impeachment evidence was prejudicial

21  and resulted in a denial of his due process rights. He asserts that he sought to impeach potentially

22  damaging evidence by introducing evidence that would show Pete Garcia had been previously

23  convicted of assault with force likely to produce great bodily injury.  However, the admission of

24  evidence is an issue of state law. Simple errors of state law do not warrant federal habeas relief. Estelle,

25  502 U.S. at 67. The ultimate question is whether the state proceedings satisfied due process. Holley,

26  568 F.3d at 1101. "[T]he presence of absence of a state law violation is largely beside the point." Id.

27  Consequently, "[t]he admission of evidence does not provide a basis for habeas relief unless it rendered

28  the trial fundamentally unfair in violation of due process." Id. (citations omitted).

3.  Analysis.

Although, at first blush, Petitioner's argument appears to raise serious constitutional concerns, further examination shows that Petitioner's claim is not that he was not permitted to impeach Garcia, but that he was not permitted to impeach Garcia with one particular piece of evidence, i.e., Garcia's prior conviction for assault.  Petitioner was permitted, however, to present evidence to the jury that Garcia was a gang member with a reputation for carrying guns, that he had been arrested on two separate occasions for possession of loaded firearms, the had had held a gun to another person's head, that he had shot Petitioner in this case, and that he had been convicted of assault with force likely to produce great bodily injury.  Put simply, as the 5th DCA noted, the trial record "clearly showed" Garcia fired a loaded gun at Petitioner on the night of the incident and struck his target.  The trial court rejected evidence by the defense of Garcia's prior conviction impliedly on the grounds that it was cumulative. Given the substantial amount of impeachment evidence the defense was allowed to present, including the fact that Garcia had shot Petitioner on the night in question, it is difficult to see how the additional fact that he had been convicted previously of another assault with a firearm would have assisted the jury in weighing the evidence or would have been anything other than cumulative.  As the state court concluded, presenting evidence that Garcia had shot another individual in the back would not, under these circumstances, "have resulted in a more favorable verdict" for Petitioner.  Accordingly, the state court adjudication was not objectively unreasonable and, under Brecht, any error was harmless.

F.  Newly Discovered Evidence Of Innocence

Petitioner next contends that newly discovered evidence of innocence requires granting habeas corpus relief.  This contention has no merit.

1.  The Superior Court Opinion.

After noting that Petitioner raised two grounds for relief in his state petition, i.e., the conviction was obtained by false evidence, and newly discovered evidence entitles him to a new trial, the Superior Court rejected Petitioner's claims, reasoning as follows:

I.  BACKGROUND

…

Both grounds of the petition are based on the Declaration of Olivia Valdovinos (Exhibit N to the petition).  The statements made by Valdovinos in her declaration are partially evidentiary in

nature and partially explanatory and/or conclusory.  For purposes of this order the factual statements that are relevant to petitioner's claims are found in paragraphs 6 and 7 of the Valdovinos declaration.

The statements contained in paragraphs 6 and 7 differ from Valdovinos' trial testimony to the extent that she now declares that she did not see a gun in Carrillo's hand before shot(s) were fired and that Carrillo could not have fired first because Valdovinos did not see a gun in petitioner's hand when the first shot was fired.

## II.  FALSE EVIDENCE ISSUE

For purposes of Penal Code section 1473, subdivision (b)(1), false evidence is substantially material or probative on the issue of guilt that was introduced against a defendant at trial.  False evidence is substantially material or probative if it is of such significance that it may have affected the outcome in the sense that with reasonable certainty it could have affected the outcome.  In other words, false evidence passes the indicated threshold if there is a reasonable probability that, had the false evidence not been introduced, the result would have been different.  The requisite reasonable probability is such as undermines the reviewing court's confidence in the outcome.  It is dependent on the totality of circumstances and must be determined objectively.  (In Re Sassounian (1995) 9 Cal. 4th 535, 546.)

Based on an objective review of the totality of the circumstances, which includes all of the evidence received by the jury, including reasonable inferences drawn therefrom, and the legal instructions that were given to the jury, this court concludes that had the alleged false evidence not been introduced at the trial that it is not reasonably probable that the outcome would have been different.  This court's confidence in the outcome is not undermined.  Petitioner argues that had "this false evidence not been introduced…a different outcome would have been almost certain."  This argument is based on petitioner's belief that Valdovinos' "false evidence" was the only evidence supporting the People's case.  Based on this court's review of the record, this assertion ignores that nature and extent of all the other inculpatory evidence and the reasonable inferences that could have been permissibly drawn therefrom.  When the alleged "false evidence" is placed in context with all of the other evidence presented to the jury, then a different outcome was not reasonably probable.

## III.  NEWLY DISCOVERED EVIDENCE ISSUE

Carrillo's argument on this ground can be readily resolved.  For Carrillo to prevail on this argument, he must present newly discovered evidence at which point he may introduce any evidence not presented at trial and which is not merely cumulative in relation to evidence which was presented at trial.  (In Re Hall (1981) 30 Cal.3d 408, 420.)  In the instant case the "newly discovered evidence" is the information contained in Valdovinos' declaration, i.e., that the [sic] Carrillo was not holding a firearm when Valdovinos heard the first shot.  That is clearly cumulative to evidence presented at trial.  (See e.g., Baca testimony TT 261, lines 9-19; Martinex testimony, TT 331, lines 8-17; and Lopez testimony, TT 354, Lines 4-17.)

In as much as the "newly discovered evidence" is cumulative in nature it is not the basis upon which petitioner can seek relief as "newly discovered evidence."  This rule is consistent with the broader principles that a criminal judgment may be collaterally attacked on habeas corpus on the basis of newly discovered evidence if such evidence casts fundamental doubt on the accuracy and reliability of the proceedings.  At the guilt phase, such evidence, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability.  (In Re Lawley (2008) 42 Cal.4th 1231, 1239.)  Herein, the newly discovered evidence does not undermine the entire prosecution case nor does it point unerringly to innocence or reduced culpability.

1   (LD 18, pp. 1-3).

2                 2.  <u>Federal Standard</u>.

3        A petitioner who is in state custody and wishes to collaterally challenge his conviction by a

4   petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The

5   exhaustion doctrine is based on comity to the state and gives the state court the initial opportunity to

6   correct the alleged constitutional deprivations.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991); <u>Rose</u>

7   <u>v. Lundy</u>, 455 U.S. 509, 518 (1982); <u>Buffalo v. Sunn</u>, 854 F.2d 1158, 1163 (9th Cir. 1988).

8        A petitioner can satisfy the exhaustion requirement by providing the highest state court with a

9   full and fair opportunity to consider each claim before presenting it to the federal court. <u>Duncan v.</u>

10  <u>Henry</u>, 513 U.S. 364, 365 (1995); <u>Picard v. Connor</u>, 404 U.S. 270, 276 (1971); <u>Johnson v. Zenon</u>, 88

11  F.3d 828, 829 (9th Cir. 1996).  In this instance, the highest state court would be the California Supreme

12  Court.  A federal court will find that the highest state court was given a full and fair opportunity to hear

13  a claim if the petitioner has presented the highest state court with the claim's factual and legal basis.

14  <u>Duncan</u>, 513 U.S. at 365 (legal basis); <u>Kenney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992) (factual basis).

15       Additionally, the petitioner must have specifically told the state court that he was raising a

16  federal constitutional claim.  <u>Duncan</u>, 513 U.S. at 365-66; <u>Lyons v. Crawford</u>, 232 F.3d 666, 669 (9th

17  Cir.2000), *amended*, 247 F.3d 904 (2001); <u>Hiivala v. Wood</u>, 195 F.3d 1098, 1106 (9th Cir.1999);

18  <u>Keating v. Hood</u>, 133 F.3d 1240, 1241 (9th Cir.1998).

19               3.  <u>Analysis</u>.

20       Respondent argues that Petitioner's claims of false testimony and newly discovered evidence

21  raise no federal issues and thus are not cognizable under § 2254.  The Court agrees.

22       In the instant petition, Petitioner argues newly-discovered evidence constitutes grounds for

23  habeas relief if the evidence bears upon the constitutional of the petitioner's detention and if it is shown

24  the new evidence "would probably have resulted in the defendant's acquittal."  (Doc. 2, p. 55).

25  Petitioner cites to California law permitting a prisoner to seek habeas relief where "[f]alse evidence that

26  is substantially material or probative on the issue of guilt or punishment was introduced against [him] at

27  any hearing or trial relating to his incarceration…," citing Cal. Pen. Code § 1473(b)(1).  (<u>Id</u>.).

28       Respondent points out that these two inter-related claims were presented to the state courts,

1   including the California Supreme Court, only as violations of state law, i.e., as a violation of §

2   1473(b)(1), for false evidence, and § 1473.6(b), for newly discovered evidence.  Nowhere in

3   Petitioner's state court papers does he present to the state court a federal question regarding either the

4   newly discovered evidence or false evidence claims.  (LD 14, pp. 17; 19; LD 19, pp. 39-42).

5          In the Traverse, Petitioner does not attempt to rebut Respondent's claim of lack of exhaustion.

6   Rather, Petitioner argues tepidly that a "freestanding claim of actual innocence…will support a federal

7   claim."  (Doc. 14, p. 19).  However, what will "support" a federal claim and what may be the basis for a

8   federal claim are quite different.  Petitioner does not cite, and the Court is unaware of, any federal

9   authority that a petitioner may maintain a free-standing claim of actual innocence based on newly

10  discovered evidence.  That being the case, the issues of false evidence and newly discovered evidence

11  of innocence are questions of state law only, which are, as mentioned, not cognizable under federal

12  habeas law.  Since Petitioner has never presented these issues as federal constitutional violations, the

13  may not now be raised as federal claims because they are unexhausted.  Put another way, as federal

14  claims, they are unexhausted; as state claims, they are non-cognizable.  For those reasons, the Court

15  **DENIES** this claim for relief.

16         G.  Ineffective Assistance Of Counsel

17         Petitioner contends that his trial counsel was ineffective for failing to object to the prosecutor's

18  argument that Petitioner was a trespasser and Garcia was entitled to fire first.  (LD 19).  This contention

19  is without merit.

20             1.  Standard of Review.

21         Petitioner first raised this issue in his state habeas petition in the California Supreme Court.

22  Since the California Supreme Court summarily denied the petition, there is no "reasoned decision" for

23  this Court to review.  When a state court reaches a decision on the merits but provides no reasoning to

24  support its conclusion, a federal habeas court independently reviews the record to determine whether

25  habeas corpus relief is available under § 2254(d).  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011);

26  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003); Greene v. Lambert, 288 F.3d 1081, 1089 (9th

27  Cir.2002) (holding that when there is an adjudication on the merits but no reason for the decision, the

28  court must review the complete record to determine whether resolution of the case constitutes an

42

unreasonable application of clearly established federal law); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.").  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S.Ct. at 784.  Accordingly, this Court will independently review the claim herein.

2.  Federal Legal Standard For Ineffective Assistance of Counsel.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision

1    unreasonably applied this general <u>Strickland</u> standard for ineffective assistance. <u>Knowles v.</u>

2    <u>Mirzayance</u>, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009). Accordingly, the question "is not whether a

3    federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect but

4    whether that determination was unreasonable–a substantially higher threshold." <u>Schriro v. Landrigan</u>,

5    550 U.S. 465, 473 (2007); <u>Knowles</u>, 129 S.Ct. at 1420. In effect, the AEDPA standard is "doubly

6    deferential" because it requires that it be shown not only that the state court determination was

7    erroneous, but also that it was objectively unreasonable. <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003).

8    Moreover, because the <u>Strickland</u> standard is a general standard, a state court has even more latitude to

9    reasonably determine that a defendant has not satisfied that standard. <u>See</u> <u>Yarborough v. Alvarado</u>, 541

10   U.S. 652, 664 (2004)("[E]valuating whether a rule application was unreasonable requires considering

11   the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in

12   case-by-case determinations").

13          Here, the state court identified the appropriate federal standard by applying <u>Strickland</u>. Thus,

14   the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was

15   neither deficient nor prejudicial, was not contrary to or an unreasonable application of <u>Strickland</u>. For

16   the reasons discussed below, the Court concludes that it was not.

17                3. <u>Analysis</u>.

18          In his Traverse, Petitioner concedes Respondent's argument that defense counsel could not have

19   objected to the prosecutor's arguments because it was based upon jury instructions that were already

20   approved by the trial judge and given to the jurors. As Petitioner notes, the "prosecutor's argument was

21   squarely based on CALCRIM 3475, that suggested that the defendant was a trespasser and therefore

22   could be ejected by 'reasonable force," up to and including the use of lethal force by Pete Garcia.

23   (Doc. 14, p. 20). Petitioner also agrees, "[a] prosecution argument that merely sums up the trial court's

24   jury instructions cannot be objected to." (<u>Id</u>.).

25          Based upon Petitioner's concession that trial counsel could not have objected to the prosecutor's

26   comments, no basis exists for a claim that counsel was ineffective for failing to make an objection to

27   such comments. In making his concession, Petitioner emphasizes his claim that the instruction itself

28   was erroneous and violated his constitutional rights, a claim previously addressed, and rejected, in this

44

1   Order. Accordingly, based upon its independent review of this claim, the Court concludes that it should

2   be denied.

3          Moreover, the Court declines to issue a certificate of appealability.  A state prisoner seeking a

4   writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and

5   an appeal is only allowed in certain circumstances.  Miller-El v. Cockrell, 537 U.S. 322, 335-336

6   (2003).   The controlling statute in determining whether to issue a certificate of appealability is 28

7   U.S.C. § 2253, which provides as follows:

8          (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge,
               the final order shall be subject to review, on appeal, by the court of appeals for the circuit in
9              which the proceeding is held.

10         (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a
               warrant to remove to another district or place for commitment or trial a person charged with
11             a criminal offense against the United States, or to test the validity of such person's detention
               pending removal proceedings.

12
           (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be
13         taken to the court of appeals from—

14                (A) the final order in a habeas corpus proceeding in which the detention
                  complained of arises out of process issued by a State court;  or
15
                  (B) the final order in a proceeding under section 2255.
16
           (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a
17         substantial showing of the denial of a constitutional right.

18         (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or
           issues satisfy the showing required by paragraph (2).
19

20         If a court denied a petitioner's petition, the court may only issue a certificate of appealability

21   when a petitioner makes a substantial showing of the denial of a constitutional right.  28 U.S.C. §

22   2253(c)(2).  To make a substantial showing, the petitioner must establish that "reasonable jurists could

23   debate whether (or, for that matter, agree that) the petition should have been resolved in a different

24   manner or that the issues presented were 'adequate to deserve encouragement to proceed further'."

25   Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

26         In the present case, the Court finds that Petitioner has not made the required substantial

27   showing of the denial of a constitutional right to justify the issuance of a certificate of appealability.

28   Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal

45

habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Thus, the Court DECLINES to issue a certificate of appealability.

## ORDER

For the foregoing reasons, the Court HEREBY ORDERS as follows:

1.  The petition for writ of habeas corpus (Doc. 2), is DENIED with prejudice;

2.  The Clerk of the Court is DIRECTED to enter judgment and close the file;

3.  The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **April 15, 2015**                        **/s/ Jennifer L. Thurston**
                                      UNITED STATES MAGISTRATE JUDGE